No. 90,066

STATE OF KANSAS, *Appellee,* v. THEODORE V. HORN, II, *Appellant.*
(91 P.3d 517)

Opinion filed June 18, 2004.

*Sarah Ellen Johnson,* assistant appellate defender, argued the cause and was on the brief for appellant.

*Lesley A. Isherwood,* assistant county attorney, argued the cause, and *Nola Foulston,* district attorney, and *Phill Kline,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: Theodore V. Horn, II, was convicted by a jury of first-degree premeditated murder for the death of his biological grand-mother, Tina Weaver. Based upon the district court's finding that the crime was heinous, atrocious, and cruel, he was given a hard 50 life sentence. Our jurisdiction is under K.S.A. 22-3601(b)(1), a maximum sentence of life imprisonment imposed.

The issues on appeal and this court's accompanying holdings are as follows:

1. Did the district court err by denying defendant's motion to suppress all evidence? No.

2. Did the district court err by denying defendant's motion in limine to exclude evidence of a pornographic magazine and alle-gations relating to sexual assault? No.

3. Did the district court err by refusing to instruct the jury on voluntary manslaughter as a lesser included offense? No.

4. Is Kansas' hard 50 life sentence, K.S.A. 2003 Supp. 21-4635 *et seq.*, without a jury finding beyond a reasonable doubt that aggravating circumstances occurred, a violation of the Sixth and Fourteenth Amendments to the United States Constitution? No.

Accordingly, we affirm.

<u>FACTS</u>

Theodore V. Horn, II, had been an alcoholic for years. When his girlfriend kicked him out of her residence because he had resumed his drinking, he moved in with his grandmother, Tina Weaver, in May 2002. Weaver had raised Horn, and he called her "Mom." She disapproved of his drinking and had called the police when he had previously been drinking or had been drunk at her house. She had once obtained a protection from abuse order against him, though it had expired in June 2000.

On Friday, May 17, 2002 — within a week or two of Horn's moving in with Weaver — Krystal Kern, who lived across the street, left for work around noon. She saw Weaver standing inside Weaver's house staring out through the screen door. Kern waved, but Weaver did not acknowledge her, which was unusual because Weaver would always wave, tell her good morning, and wish her a nice day. Kern then heard a man's loud, angry voice coming from inside the house, but did not see Weaver react in any way. Kern never saw her again.

Another neighbor, Greg Fisher, last saw Weaver on May 17 between 5 and 5:30 p.m. when she stuck her head outside her door. The next morning, May 18, he stopped at Weaver's to drop off a bag of fruit and vegetables. He rang the bell, but received no answer, so he left the bag on the doorknob. That afternoon at 2:15 he received a call from his daughter advising him that another neighbor, Betty Roux, was requesting his assistance in checking on Weaver's welfare. When he later approached Weaver's door, he noticed the bag of fruit and vegetables still hanging outside. He received no response to the buzzer, and when he attempted to open the door, a safety chain only allowed it to open several inches.

He detected a commotion in the dark living room and Horn called out to say they had overslept but everything was ok. As Fisher walked away, Roux advised that she had already called 911 to come and check on Weaver.

Officer Gregory Johnson of the Wichita police was dispatched that day to 422 North Custer for a check-welfare call. He had been told that he was going to check the welfare of an 89-year-old female whom the neighbors said they had not seen in a couple of days. Officer Michelle Woodrow arrived at the same time, *i.e.*, approximately 3 p.m. Emergency medical services personnel and ambulances also arrived.

The officers spoke to Roux and Roux's daughter. Roux told them that she had not seen Weaver for a couple of days and that she was concerned because she was used to Weaver being at her front door collecting mail. Roux was concerned because the mail was still in Weaver's mail slot, which was unusual. According to Roux, Weaver knew exactly when the mail was supposed to arrive, and if it was a few minutes late, she would call her neighbors. Roux told Officer Johnson that she had knocked on Weaver's door but Horn refused to open it. Horn told Roux that Weaver was okay, but Roux thought his response was unusual so she called 911.

After the conversation with Roux and her daughter in Roux's front yard, Officer Johnson and Officer Woodrow walked next door to 422 North Custer. Johnson confirmed the mail was still in the slot next to the door. He opened the screen door and knocked on the inner door. Johnson heard a male voice from inside ask who it was, and Johnson identified himself as a police officer. For 4-5 minutes, Johnson continued knocking and calling for Horn by name. Officer Woodrow checked to see if the door was locked and pushed the door open. The door opened 3 to 4 inches, but a security chain prevented it from opening further. Through the opening they were able to see what appeared to be the shape of a body nearby under a blanket.

When Horn eventually came to the door, he told the officers he and Weaver were asleep and he was naked. Johnson observed Horn was naked and directed him to get dressed because of the presence of a female officer. He also told Horn to open the door so they

could check on his mother. At that point Horn stated, "She's dead. I killed her." He was again directed to put on pants and open the door, to which he stated several times, "This is murder. I killed my mom. I love my mom." After he put on his pants and unchained the door, he was placed in handcuffs. Three additional times he repeated, "This is murder. I killed my mom. I love my mom." Horn was later taken to a hospital in an ambulance because he had passed out in the patrol car.

At the hospital, Lieutenant Kenneth Landwehr observed a blood smear on Horn's right forearm and removed the blood smear with a set of swabs. He observed Horn's hands and detected no sign of injury. Landwehr also took a swab of Horn's penis before medical personnel cleaned it.

Mark Alexander was on duty as a detention deputy at the Sedgwick County jail at 7 p.m. when Horn was brought in. According to Alexander, Horn was screaming, saying that Weaver had been "bitching" at him and he got mad and twisted her neck and took a saw and started cutting her head off. Horn told the officers that she had been dead since Thursday, May 16.

Police found Weaver's body in the living room covered with a green blanket. They observed a massive trauma to her head and a massive amount of pooling of blood underneath it. A wooden carpenter's level, broken and blood-spotted, was nearby. They also observed she was partially decapitated and a carpenter's handsaw was underneath her body. The saw contained hair and blood, consistent with a pattern of blood drops near Weaver's head. In front of the couch and 3 feet from Weaver's feet was a pornographic magazine entitled "Live Young Girls" folded in half lengthwise. The magazine contained Horn's semen and one of his fingerprints.

The forensic pathologist who investigated the cause of Weaver's death testified that based on the receding of rigor mortis in the body, she had probably been dead since 10:15 p.m. on Friday, May 17. He concluded she had died from multiple blunt and sharp force injuries. The neck injuries were consistent with the handsaw and reflected five separate starting points, with one major cut entirely through the vertebrae and ending at the trachea. The pathologist concluded that the major cut alone took between 30 minutes and

2 hours to inflict and that Weaver was still alive when the sawing occurred.

Weaver's body was partially clad, with her upper garments pushed over a shoulder and her slacks pulled down to the midpoint on her buttocks. Her genital area also contained small lacerations and abrasions, but no seminal fluid was found on swabs taken from her or her clothing. Horn's DNA was not found on Weaver's fingernails, her clothing, or the bloodstains on the tools used to kill her. Weaver's DNA was not found on Horn's jeans, his penile swab, or his forearm swab.

At trial, Horn testified that on Friday, May 17, he had called his employer around 5 a.m. to see if he would be working that day. The employer had no work for him, so he began to drink. He remembered waking up after passing out on the couch and Weaver griping at him. He got up and ate something in the kitchen. Horn remembered the program Wheel of Fortune was on the television, which typically begins at 6:30 p.m. He returned to the couch and passed out again. It was dark when he woke up again and he learned he had urinated on himself. He got up, but did not remember what he did before he fell asleep again.

Horn testified that he first saw Weaver's body when he retrieved the newspaper. He started crying, got drunk again, and put a spread over her. He had no recollection of killing her.

## ANALYSIS

Issue 1: *Did the district court err by denying defendant's motion to suppress all evidence?*

Horn filed a motion to suppress all the evidence found at the Weaver house, arguing that the officers' opening of the door and looking inside was the beginning of a search and seizure which violated his rights under the Fourth Amendment to the United States Constitution. His motion included his statements to the police, citing *Wong Sun v. United States,* 371 U.S. 471, 485, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963) (verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest is no less the fruit of official illegality than the more common tangible fruits of the unwarranted intrusion).

After a hearing at which only Officer Johnson testified, the district court denied the motion. On appeal, Horn renews the arguments made to the district court; if he is successful, the remaining issues are moot.

Our standard of review is well known:

" 'When reviewing a motion to suppress evidence, an appellate court reviews the factual underpinnings of a district court's decision " 'by a substantial competent evidence standard and the ultimate legal conclusion drawn from those facts by a de novo standard. An appellate court does not reweigh the evidence. The ultimate determination of the suppression of the evidence is a legal question requiring independent appellate review.' " [Citations omitted.]' " *State v. Mendez,* 275 Kan. 412, 416, 66 P.3d 811 (2003)

The district court made the following statement when denying Horn's motion to suppress:

"All right. Based on — I have reviewed, in fact, the motions that have been filed here. And after considering the evidence presented and the arguments of counsel, it's obvious to this Court that exigent circumstances, in fact, existed in this situation given the officer — information and knowledge the officers had prior to opening the door. Opening the door was appropriate under those circumstances and necessary.

"After opening the door, it was patently obvious that exigent circumstances existed by any measure and further entry was appropriate and necessary.

"Now, as to the penile swabs and evidence collected there, there was an emergency situation existing. The question as to whether or not Detective Landwehr could have directed health care providers to provide — to not provide treatment they had already deemed to be appropriate and necessary to a later unspecified time to await a warrant, I don't think that option was available. I believe that it would have been inappropriate if not impossible to put off such procedures once medical personnel had made that determination absent the use of threat or force by the police against the health care providers.

"And, therefore, the motions and all requests by the defense at the time are overruled."

We begin by determining whether a search occurred. The district court apparently concluded that one had.

A search occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. *Maryland v. Macon,* 472 U.S. 463, 469, 86 L. Ed. 2d 370, 105 S. Ct. 2778 (1985). One's reasonable expectation of privacy in the home is entitled to unique sensitivity. *State v. Platten,* 225 Kan. 764, 769, 594 P.2d 201 (1979).

The viewing by police into an area where an individual has a subjective expectation of privacy that society accepts as reasonable constitutes a search. *State v. Morris*, 27 Kan. App. 2d 155, 158, 999 P.2d 283, *rev. denied* 269 Kan. 938 (2000). Accordingly, the officers' opening the door and looking into the house where Horn was living was a warrantless search. See *Mitchell v. State*, 294 Ark. 264, 269, 742 S.W.2d 895 (1988) (even though door was unlocked and officer slightly opened door to peek inside; warrantless entry into home clearly violated Fourth Amendment's prohibition of unreasonable searches).

We acknowledge that unreasonable searches and seizures are constitutionally prohibited and, unless a search falls within one of a few exceptions, a warrantless search is per se unreasonable. *Mendez*, 275 Kan. at 420-21. We further acknowledge that the exclusionary rule prohibits the admission of the "fruits" of illegally seized evidence, *i.e.*, any information, object, or testimony uncovered or obtained, directly or indirectly, as a result of the illegally seized evidence or any leads obtained therefrom. 275 Kan. at 421.

While a warrantless search was performed in the instant case, the State argues that the search was valid under the emergency doctrine, one of several exceptions to the search warrant requirement recognized in Kansas. See *Mendez*, 275 Kan. at 421. As the United States Supreme Court described the doctrine in *Mincey v. Arizona*, 437 U.S. 385, 392, 57 L. Ed. 2d 290, 98 S. Ct. 2408 (1978):

"We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid . . . 'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.' [Citation omitted.]"

Our Court of Appeals echoed *Mincey* in *State v. Jones*, 24 Kan. App. 2d 405, 409-10, 947 P.2d 1030 (1997):

"The emergency doctrine reflects a recognition that the police perform a community caretaking function which goes beyond fighting crime. [Citation omitted.] Under this function, the community looks to the police to render aid and assistance to protect lives and property on an emergency basis regardless of whether a crime is involved."

In *Mendez,* 275 Kan. at 425, this court approved the use in *Jones* of a three-part test from *People v. Mitchell,* 39 N.Y.2d 173, 177-78, 383 N.Y.S.2d 246, 347 N.E.2d 607 (1976), for analyzing the applicability of the emergency doctrine:

" ' "(1) The police must have reasonable grounds to believe that [1] there is an emergency at hand and [2] an immediate need for their assistance for the protection of life or property;

" '(2) The search must not be primarily motivated by intent to arrest and seize evidence.

" '(3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched." ' "

All three elements must be met to satisfy the emergency doctrine. See *Mendez,* 275 Kan. at 428. However, Horn disputes only the first element. The burden of establishing this element is on the State. See *State v. Anderson,* 259 Kan. 16, Syl. ¶ 1, 910 P.2d 180 (1996) (on a motion to suppress evidence, State bears the burden of proving the lawfulness of the search and seizure).

, As the *Jones* court further observed: "It is important to keep in mind that reasonable grounds under the emergency doctrine differs from the probable cause required under the more familiar crime-related exigent circumstances exception." 24 Kan. App. 2d at 414. It quoted from *State v. Fisher,* 141 Ariz. 227, 240-41, 686 P.2d 750, *cert. denied* 469 U.S. 1066 (1984), regarding this crucial difference:

" 'The *exigent circumstances exception* is triggered when the police, with probable cause but no warrant, enter a dwelling in the reasonable belief that the delay necessary to obtain a warrant threatens the destruction of evidence, [citations omitted], or when they have a reasonable belief that a crime is in progress or has just been committed in a dwelling and the delay attendant to obtaining a warrant endangers the safety or life of a person therein. [Citations omitted.] . . . .

" 'Conversely, the *emergency aid doctrine* is triggered when the police enter a dwelling in the reasonable, good-faith belief that there is someone within in need of immediate aid or assistance. In cases in which this doctrine applies there is no probable cause which would justify issuance of a search warrant, . . . and the police are not entering to arrest, search, or gather evidence.' " (Emphasis added.) 24 Kan. App. 2d at 414.

As the *Jones* court stated, ultimately the question of whether the officer had a "reasonable, good faith belief that there is someone

within in need of immediate aid or assistance" is based upon what the officer understood at the time — not necessarily whether such immediate aid or assistance was needed. 24 Kan. App. 2d at 408. We agree that an objective standard as to the reasonableness of the officer's belief must be applied, *i.e.*, whether there is evidence which would lead a prudent and reasonable officer to see a need to act. See *Jones*, 24 Kan. App. 2d at 416 (the officers' actions are judged on the basis of the facts facing them at moment of their decision and are evaluated objectively). We also acknowledge that as this standard is applied to the circumstances then confronting the officer, it also includes the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences. Stated a different way: "The question is whether 'the officers would have been derelict in their duty had they acted otherwise.' " See 3 La Fave, Search and Seizure, § 6.6(a) pp. 391-92 (3d ed. 1996).

In the instant case, Horn predictably claims that the police did not have reasonable grounds to believe that an emergency existed. He further argues that the district judge failed to make any specific findings of fact and then found that exigent circumstances, not an emergency, existed. The State responds that the district court's use of the term "exigent" was simply a mixing with the term "emergency," that does not invalidate the court's conclusion that a warrantless search exception existed.

The district court based its finding of an exception on the information the officers had prior to opening the door, but as evidenced by its statements set forth previously in this opinion, it did not specify what that information was. It also did not articulate clearly the specific legal doctrine relied upon in upholding the search. We agree with the State that the district court's use of the terms "exigent" and "emergency" when referring to the actions at the Weaver home and at the hospital, respectively, does not invalidate the court's conclusion that an exception existed. Moreover, the emergency doctrine may be used to uphold the search, even if not relied upon by the court. See *State v. Bryant,* 272 Kan. 1204, 1209, 38 P.3d 661 (2002) (appellate court may uphold decision of trial court on grounds alternate to those relied on at the trial level).

We hold that the district court's findings, while by no means copious, are supported by substantial competent evidence as provided by Officer Johnson's testimony at the suppression hearing. The information known to him before Officer Woodrow partially pushed open the door occurred in the following chronological order.

Dispatch sent Officer Johnson to a residence at 422 N. Custer "to check the welfare of an elderly woman." Checking on the welfare of the elderly is part of his regular job duties and he does it on a regular basis. He arrived at approximately 3 p.m., the same time as Officer Woodrow.

He and Woodrow contacted the neighbor, Mrs. Betty Roux, and Roux's adult daughter at 420 N. Custer in their front yard. Betty Roux told him that she had called 911 because she was concerned for her neighbor, Tina Weaver, whom she had not seen in a couple of days. Roux told Johnson that Weaver lived at 422 N. Custer, that Weaver was 89 years old, and that not seeing Weaver was unusual. She explained she "[u]sually would see her at the door either collecting mail or coming out the door for one reason or another." Roux expressed concern for Weaver's health and welfare because Weaver was elderly.

Roux explained that earlier in the day she had gone to Weaver's door and knocked. Ted, Weaver's son, yelled through the door and said they were ok. Roux knew Ted because he had previously lived with Weaver off and on and had just recently returned from somewhere. She told Johnson that Ted would not open the door, which concerned her because it was very unusual. In the past, he had always opened the door and let her talk to Weaver.

Officer Johnson then approached the Weaver house with Officer Woodrow. He confirmed one of Roux's statements by observing the mail was still in Weaver's slot. He could not see in the windows so he knocked on the door. He heard a male voice from inside ask "Who is it"? Johnson replied, "It's the police." Johnson continued to knock on the door and yell through the door for "Ted" to come to the door, calling him by name.

Johnson testified that after 4-5 minutes:

"When we still didn't hear anything, we didn't hear any movement or anything in the house and we knew somebody was in there, we were concerned, of course, for the elderly lady that lived there so we decided to see if the door was unlocked, *maybe we could actually see if Ted was in the front room so we could talk to him and check on what I thought was his mom at the time.*" (Emphasis added.)

Officer Woodrow then reached down, turned the door knob, and pushed the door open.

Having found substantial competent evidence to support the district court's findings regarding the information the officers had prior to opening the door, we next consider step two in our analysis of the suppression issue, a de novo review of the ultimate legal conclusion drawn from those factual findings. The district court concluded the search was valid, albeit under a somewhat different basis than a pure emergency. We acknowledge that ultimately search and seizure cases are all fact sensitive and determinative. *Mendez,* 275 Kan. at 429. We hold, however, that this case's findings of fact support the trial court's legal conclusion that the search was valid.

We base our holding in large part upon *Jones.* There, a Topeka police officer was dispatched to an apartment complex on a "check the welfare of a subject" call where he met with the parents of Tony Flamez, who were concerned about their son. 24 Kan. App. 2d at 406. They had made plans to have dinner with him 3 days before, but he had not shown up and they had not seen him since. They had called his apartment several times and left answering machine messages, but he had never answered or returned the calls. The parents said this was unusual behavior for him and that he had made a recent acquaintance of whom he was afraid.

Several police officers, together with the parents and an apartment employee, went to Tony's apartment. After knocking on the door, calling for Tony, and receiving no response, the police asked the employee to open the door with the manager's key, which he did. Inside the police discovered a man, a woman, and drugs. The Court of Appeals upheld the search and seizure under the emergency doctrine. Tony was later located in another apartment.

Similarly, in the instant case, before the police opened the Weaver door, they possessed information that an 89-year-old woman

had broken from her distinct, almost rigid, routine and had not been seen for several days. Additionally, they knew Horn had broken from his practice and had refused to open the door to allow neighbor Roux to see his grandmother that day. We acknowledge that the *Jones* facts are slightly different because there the resident completely failed to respond to the officers' knocking on the door and calling his name, while here Horn did respond orally to the knock, but then silently stalled for 4-5 minutes upon learning it was the police. Despite this difference, in the instant case the police were justified in opening the door to yell for Weaver or for Horn, or to look for Weaver. Horn's question, followed by his lengthy silence and refusal to come to the door, certainly did nothing to alleviate the officers' concerns about Weaver as expressed by Roux and as confirmed by their observations. If anything, their concerns became greater. In short, based upon what the officers knew at the time, they had a reasonable, good faith belief that there was an emergency at hand and an immediate need for their assistance for the protection of life.

As stated by the court in *Jones*:

"[P]olice are often forced to make judgment calls under circumstances where it is better to err on the side of safety. The fact that Tony was not discovered in need of help in his apartment is of no relevance. [Citation omitted.] The officers' actions are judged on the basis of the facts facing them at the moment of their decision and are evaluated objectively with due consideration for the stress of the moment and the pressure to make important decisions based on often ambiguous facts. It would indeed be tragic if Tony had lain injured or dying, or had been under restraint in the apartment, and the police had refused to take seriously the concerns of a mother and father who knew their son's habits and disposition." 24 Kan. App. 2d at 416.

Stated another way, "[t]he question is whether the 'officers would have been derelict in their duty had they acted otherwise.' " We conclude that under the facts of the instant case, they would have been.

Once it is established that the opening of the door and the officers' looking inside are permissible, they may seize any evidence that is in plain view during the course of their legitimate emergency activities. *Mincey v. Arizona,* 437 U.S. at 392-93; see *State v.*

*Gocken,* 71 Wash. App. 267, 279, 857 P.2d 1074 (1993) (once officers lawfully inside residence performing health and safety check, their discovery of evidence falls within the plain view exception to the warrant requirement). Consequently, the officers' finding of Weaver's body and the evidence surrounding it in plain view in the living room, plus Horn's repeated inculpatory statements, are admissible against him.

Issue 2: *Did the district court err by denying defendant's motion in limine to exclude evidence of a pornographic magazine and allegations of sexual assault?*

In addition to filing a motion to suppress all evidence, Horn also filed a motion in limine to exclude, among other things, the "Live Young Girls" magazine that was found near Weaver's feet. The district court denied the motion, finding the magazine was relevant to show motive for the crime. It acknowledged that motive was not an element of the crime, but nevertheless "the jury is going to be wondering why the defendant did these actions to his mother if in fact he did." After citing K.S.A. 60-445, the court also found the evidence's probative value was not outweighed by its prejudicial effect.

Horn renews his lower court argument that the magazine was erroneously admitted because it was irrelevant and, together with the allegations of sexual assault, highly prejudicial. The State responds that the magazine and allegations of sexual assault were relevant to provide motive for the murder and were not overly prejudicial.

We first observe that a motion in limine to exclude evidence should be granted if the trial court finds two factors present: (1) The material or evidence in question will be inadmissible at a trial under the rules of evidence; and (2) the mere offer of evidence or statements made during trial concerning the material will tend to prejudice the jury. *State v. Galloway,* 268 Kan. 682, 690, 1 P.3d 844 (2000).

We next observe that except as otherwise provided by statute, all relevant evidence is admissible. K.S.A. 60-407(f). Relevant evidence is defined as "evidence having any tendency in reason to

prove any material fact." K.S.A. 60-401(b). Additionally, when considering evidence of the attending circumstances at the time an accused is arrested, including articles of property which are found in his or her possession, the general rule is that they are relevant and admissible "where the circumstances logically tend to connect the accused with the crime charged." *State v. Sexton*, 256 Kan. 344, 353, 886 P.2d 811 (1994). Similarly, " '[w]hen a physical object is offered into evidence and a question arises as to its connection with either the defendant or the crime charged, unless it is clearly irrelevant, the object should be admitted for such weight and effect as the jury sees fit to give it.' " 256 Kan. at 353 (quoting *State v. Ji*, 251 Kan. 3, 15, 832 P.2d 1176 [1992]).

Here, the pornographic magazine was found 3 feet from Weaver's body. Horn's fingerprint and semen were on the magazine. Some evidence suggested a sexual assault on Weaver, *e.g.*, her shirt was up over her shoulder and her pants were down to the middle of her buttocks. Moreover, the autopsy revealed small lacerations and abrasions on her genital area. While no seminal fluid was found on Weaver or her clothing and Weaver's DNA was not present in the penile swab taken from Horn, these absences do not disprove that a sexual assault occurred; they simply constitute evidence supporting Horn's defense. Consequently, we find the magazine, as evidence supporting the State's theory of sexual assault as a motive for the murder, was relevant and properly submitted to the jury for weighing with the other evidence. See *State v. Sexton*, 256 Kan. at 352-53.

Horn next argues that even if the magazine were relevant, the magazine and the allegations of sexual assault were so prejudicial they should not have been admitted. He argues that the title of the magazine, suggesting that the subjects are minors, combined with inference of incest, would greatly prejudice the jury against him.

Where the probative value is substantially outweighed by the risk of unfair prejudice, even relevant evidence may be excluded by the judge. *State v. Meeks*, 277 Kan. 609, 618, 88 P.3d 789 (2004); see also *State v. Kingsley*, 252 Kan. 761, 770, 851 P.2d 370 (1993) (noting that despite the wording of K.S.A. 60-445, the element of surprise does not get factored into the equation). Our standard of

review of otherwise relevant evidence which arguably should have been excluded after this particular weighing is abuse of discretion. *Meeks*, 277 Kan. at 618. Discretion is abused only when no reasonable person would take the view adopted by the trial court; the burden of proof is on the party alleging the discretion is abused. *Meeks*, 277 Kan. at 618.

Here, other evidence was introduced which established that someone had beaten an 89-year-old woman by repeatedly hitting her over the head with a carpenter's level until it broke and then had attempted to cut off her head with a handsaw — for at least 30 minutes — while she was still alive. In light of the admission of this and similarly disturbing evidence, Horn fails to meet his burden of demonstrating that the court's admission of the pornographic magazine, after weighing the probative value against the prejudicial effect, was an abuse of discretion. Specifically, we cannot say that no reasonable person would take the view adopted by the trial court. See *Meeks*, 277 Kan. at 618.

**Issue 3:** *Did the district court err by refusing to instruct the jury on voluntary manslaughter as a lesser included offense?*

Horn was charged with first-degree premeditated murder. The jury was instructed on this charge and on second-degree murder. Horn argues that the jury should also have been instructed on voluntary manslaughter as a lesser included offense, and that the district court erred in refusing his request.

A trial court must instruct the jury as to lesser included crimes "[i]n cases where there is some evidence which would reasonably justify a conviction of some lesser included crime as provided in subsection (2) of K.S.A. 21-3107 and amendments thereto." K.S.A. 2003 Supp. 22-3414(3). It is well settled that voluntary manslaughter, like second-degree murder, is a lesser included offense of first-degree murder. *State v. McClanahan*, 254 Kan. 104, 109, 865 P.2d 1021 (1993).

"The evidence of a lesser included offense need not be strong or extensive as long as it presents circumstances from which the lesser offense might reasonably be inferred." *State v. Guebara*, 236 Kan. 791, 795, 696 P.2d 381 (1985). "Such an instruction must be

given even though the evidence is weak and inconclusive and consists solely of the testimony of the defendant." *State v. Follin*, 263 Kan. 28, 33, 947 P.2d 8 (1997). "However, the duty to so instruct arises only where there is evidence supporting the lesser crime. *State v. Shannon*, 258 Kan. 425, 427, 905 P.2d 649 (1995)." *State v. Spry*, 266 Kan. 523, 528, 973 P.2d 783 (1999). On review, this court views the evidence in the light most favorable to the defendant. *State v. McClanahan*, 254 Kan. at 109.

K.S.A. 21-3403 sets forth the elements of voluntary manslaughter:

"Voluntary manslaughter is the intentional killing of a human being committed:

"(a) Upon a sudden quarrel or in the heat of passion; or

"(b) upon an unreasonable but honest belief that circumstances existed that justified deadly force under K.S.A. 21-3211, 21-3212 or 21-3213 and amendments thereto.

"Voluntary manslaughter is a severity level 3, person felony."

Some basic principles on this issue were set forth by this court in *State v. Guebara*, 236 Kan. at 796-97:

"(1) Voluntary manslaughter is the intentional killing in the heat of passion as a result of severe provocation. . . .

"(2) 'Heat of passion' means any intense or vehement emotional excitement of the kind prompting violent and aggressive action, such as rage, anger, hatred, furious resentment, fright, or terror. Such emotional state of mind must be of such a degree as would cause an ordinary man to act on impulse without reflection. [Citations omitted.]

"(3) In order to reduce a homicide from murder to voluntary manslaughter, there must be provocation, and such provocation must be recognized by the law as adequate. A provocation is adequate if it is calculated to deprive a reasonable man of self-control and to cause him to act out of passion rather than reason. 2 Wharton's Criminal Law § 155. In order for a defendant to be entitled to a reduced charge because he acted in the heat of passion, his emotional state of mind must exist at the time of the act and it must have arisen from circumstances constituting *sufficient provocation*. [Citations omitted.]

"(4) The test of the sufficiency of the provocation is objective, not subjective. The provocation, whether it be 'sudden quarrel' or some other form of provocation, must be sufficient to cause an ordinary man to lose control of his actions and his reason. [Citations omitted.] In applying the objective standard for measuring the sufficiency of the provocation, the standard precludes consideration of the innate peculiarities of the individual defendant. The fact that his intelligence is not high and his passion is easily aroused will not be considered in this connection.

*State v. Jackson,* 226 Kan. [302,] 307 [, 597 P.2d 255 (1979), *cert. denied* 445 U.S. 952 (1980)].

"(5) Mere words or gestures, however insulting, do not constitute adequate provocation, but insulting words when accompanied by other conduct, such as assault, may be considered. 2 Wharton's Criminal Law § 156. In *State v. Buffington,* 71 Kan. 804, 81 Pac. 465 (1905), it was held that the trial court properly instructed the jury that no words, however abusive and insulting, will justify an assault or will justify a sufficient provocation to reduce to manslaughter what otherwise would be murder. See also *State v. Hardisty,* 121 Kan. 576, 249 Pac. 617 (1926)."

With these standards in mind, we must determine whether there was sufficient evidence of an adequate provocation to instruct on voluntary manslaughter. Horn argues sufficient evidence is present based upon two sources: (1) the testimony of Krystal Kern and (2) testimony that Weaver had previously complained about Horn's drinking. The State points to a possible third source: the testimony of Deputy Alexander. We agree that all should be considered when we review "the evidence in the light most favorable to the defendant." *State v. McClanahan,* 254 Kan. at 109.

Krystal Kern testified that as she left for work around noon on Friday, May 17, she saw Weaver standing inside Weaver's house staring through the screen door and waved to Weaver, but Weaver did not acknowledge her. Kern then heard a man's loud, angry voice coming from Weaver's house, but did not see Weaver react in any way. Horn couples Kern's testimony with his testimony regarding the "discordant relationship" he had had with Weaver concerning his drinking to conclude he may have been provoked on the day of her death.

However, Horn's argument that Kern's observation evidences provocation is virtually eliminated by the testimony of Greg Fisher, who saw Weaver with her head out of the front door approximately 5 hours later. "With the passing of time after provocation, passion cools and gives way to reason and mastery over one's passion. An act of violence separated from the provocation by sufficient cooling time is the product of malice and cold calculation rather than heat of passion." *State v. Follin,* 263 Kan. at 38; see *State v. Spry,* 266 Kan. at 528-29. Moreover, mere words or gestures, however in-

sulting, do not constitute adequate provocation. *State v. Guebara,* 236 Kan. at 797.

Additionally, beyond the Kern testimony, Horn points to no evidence even suggesting that the discordant relationship somehow resulted in a provocation which caused her death. His major problem is that he simply has no recollection of killing Weaver. Furthermore, any suggestion that the killing was in the heat of passion is virtually eliminated by the coroner's testimony indicating that after someone struck Weaver repeatedly with the carpenter's level, someone then methodically began to saw her head off — while she was alive — for at least 30 minutes.

Finally, while the State raises the possibility of Deputy Alexander's testimony as providing the basis for Horn's provocation, we agree with the State that it is insufficient. According to Alexander, Horn was screaming that Weaver was "bitching" at him, he got mad and twisted her neck, then took a saw and started cutting her head off. Mere words or gestures by Weaver, however insulting, do not constitute adequate provocation. See *State v. Guebara,* 236 Kan. at 797.

Horn's vague evidence simply does not meet the provocation threshold — that which is calculated to deprive a reasonable man of self-control and to cause him to act out of passion rather than reason — to warrant the voluntary manslaughter instruction.

Finally, we observe that even if the instruction should have been given, the error does not warrant reversal. Since the instruction had been requested, denied, and objection made, our standard is as follows:

" 'When reviewing challenges to jury instructions, we are required to consider all the instructions together, read as a whole, and not to isolate any one instruction. If the instructions properly and fairly state the law as applied to the facts of the case, and a jury could not reasonably have been misled by them, the instructions do not constitute reversible error even if they are in some way erroneous.' " *State v. Peterson,* 273 Kan. 217, 221, 42 P.3d 137 (2002) (quoting *State v. Mitchell,* 269 Kan. 349, 355, 7 P.3d 1135 [2000])

In this case, the jury was instructed on both first-degree premeditated murder and second-degree murder, a lesser included offense. Instruction No. 5 provided:

"If you do not agree that the defendant is guilty of murder in the first degree, *you should then consider the lesser included offense of murder in the second degree.*

"To establish this charge, each of the following claims must be proved:

"1. That the defendant intentionally killed Tina A. Weaver; and

"2. That this act occurred on or about the 17th day of May, 2002, to the 18th day of May, 2002, in Sedgwick County, Kansas." (Emphasis added.)

The jury is presumed to follow the instructions. *State v. Kunellis,* 276 Kan. 461, 484, 78 P.3d 776 (2003). Here, the jury convicted Horn of first-degree premeditated murder, and did not descend to the lesser included charge of second-degree murder. As the district court pointed out at sentencing about the failure to give the jury instructions on yet another lesser included charge:

"In order to reach voluntary manslaughter, according to the instructions, the jury would have at least had to have reached second-degree murder, which they didn't in this case. So, really, the issue is moot because even if the Court had given voluntary manslaughter, the jury in this case apparently would have never reached it."

While we disagree that the issue became moot, neither did it constitute reversible error. See *State v. Metcalf,* 203 Kan. 63, 67, 452 P.2d 842 (1969) ("rule has been well established that when a defendant has been charged with and convicted of murder in the first degree, the correctness of instructions relating to manslaughter becomes immaterial"). *Accord, State v. Spencer,* 186 Kan. 298, 303-04, 349 P.2d 920 (1960); *Ross v. State,* 482 A.2d 727, 736 (Del. 1984) (substantial body of law in other jurisdictions that a finding of guilt to a greater offense renders harmless any error in instructions on lesser included offenses).

The case of *Easter v. State,* 306 Ark. 615, 816 S.W.2d 602 (1991), is directly on point. There, the defendant argued that it was reversible error for the trial court to decline to instruct on the lesser included offense of manslaughter, when it had instructed on first- and second-degree murder. As the Arkansas Supreme Court held:

"When a lesser included offense has been the subject of an instruction, and the jury convicts of the greater offense, error resulting from failure to give an instruction on another still lesser included offense is cured. [Citations omitted.] This is commonly referred to as 'the skip rule.' " 306 Ark. at 620.

Issue 4: *Is Kansas' hard 50 life sentence, without a jury finding beyond a reasonable doubt that aggravating circumstances occurred, a violation of the Sixth and Fourteenth Amendments to the United States Constitution?*

This issue was not raised below, but the district court addressed it at sentencing, citing *State v. Conley*, 270 Kan. 18, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001), as authority that the State's procedure is constitutional. Since that time, Horn's identical argument has been expressly rejected by this court in *State v. Washington*, 275 Kan. 644, 680, 68 P.3d 134 (2003), and *State v. Boldridge*, 274 Kan. 795, 812, 57 P.3d 8 (2002), *cert. denied* 155 L. Ed. 2d 494 (2003). Horn's argument therefore has no merit.

Affirmed.