No. 99,600

STATE OF KANSAS, *Appellee*, v. GAYL NORTHCUTT, *Appellant*.

(224 P.3d 564)

Opinion filed February 26, 2010

*Meryl Carver-Allmond*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Jerome A. Gorman*, district attorney, argued the cause, and *Steve Six*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: Defendant Gayl Northcutt appeals his convictions for premeditated first-degree murder, in violation of K.S.A. 21-3401, and conspiracy to commit first-degree murder, in violation of K.S.A. 21-3302. The defendant questions the sufficiency of the evidence with respect to the conspiracy conviction and also alleges the trial court erred by not instructing the jury on voluntary manslaughter as a lesser included offense. Both issues are inherently factual, and the facts of this case do not support Northcutt's arguments on either issue. Consequently, Northcutt's convictions are affirmed.

## PRELIMINARY PROCEDURAL ISSUE

After David Mason's family reported him missing, police began an investigation that led them to suspect Mason had been killed by Northcutt and his brother. Two custodial interviews of Northcutt confirmed he had fought with Mason and that Mason was dead. In fact, after the interviews, Northcutt showed officers where he and his brother had buried Mason.

At Northcutt's trial, audiotapes of the two custodial interviews were played to the jury. In both interviews, Northcutt admitted to beating Mason, and in the second interview he confessed that he and his brother had gone to Mason's apartment with the intent to kill Mason. Consequently, the audiotapes are important to the analysis of Northcutt's factually-based appellate arguments. Yet, when this court began its review of the case, the audiotapes of the interviews—trial exhibits 57 and 58—were not in the record on appeal.

During oral arguments, the court questioned counsel regarding the burden of creating an adequate record on appeal. At that point, both counsel were alerted to the absence of the tape recordings from the record. In response, both counsel advised the court the

exhibits had been designated for inclusion in the record on appeal through a supplemental designation, which was also not in this court's record. It was later reported to the court that the original exhibits could not be located. Northcutt then filed a "Motion to Order Transmission of the Record on Appeal." In support of the motion, Northcutt's appellate counsel stated that she had received the tapes after the appeal had been docketed, relied on the tapes in preparing Northcutt's appellate brief, and then returned the tapes to the Wyandotte County District Court Clerk's office. Although the parties' statements of facts did not significantly differ, Northcutt argued his constitutional due process and equal protection rights would be violated if this court did not have the opportunity to review the tapes.

After the motion was filed, the Clerk of the Appellate Courts, with the cooperation of counsel, located copies of the audiotapes and a police department transcript of the recorded interviews. Based on the availability of these substitutes, this court

"ordered [the parties] to notify this court within (10) days if there is any objection to the court's addition of the audio copies and transcripts to the record on appeal, as substitutes for the unavailable exhibits. If objection is made, the party should also address why this matter should not be remanded for a hearing regarding the unavailability of the exhibits and alternatives for preservation of a record on appeal. See Rule 3.02 (2009 Kan. Ct. R. Annot. 22); Rule 3.04 (2009 Kan. Ct. R. Annot. 26)."

The State responded, indicating it did not object to the addition to the record. Northcutt did not file an objection. Hence, the audiotapes and transcript were submitted to the court as part of the record on appeal. As a result of this procedure and Northcutt's waiver of any objection, the record is complete, Northcutt's motion is moot, and this appeal is ready for decision.

## FACTS

The record reveals that Mason died the night of March 15, 2006, and that Mason had spent much of that day with Northcutt. Virtually all of the evidence regarding what occurred that day came from Northcutt's two custodial interviews and his trial testimony.

Although there are common themes and details in his various statements, there are also variances.

In his first interview with police, Northcutt explained that after spending most of March 15 with Mason, he went home mid-afternoon. That evening he went to Mason's apartment, which Mason shared with Northcutt's younger brother, John. At the apartment, Mason and Northcutt "got into a kind of pushing, shoving argument." Northcutt explained he had confronted Mason about a dispute between Mason and his brother regarding rent money and because Mason owed Northcutt for some expensive camera equipment that Mason had borrowed and not returned, claiming the equipment had been stolen from him. Northcutt told Mason to "take care of business" and then shoved Mason. Mason fell and hit his head on a metal bed rail. Mason then stood up, slipped, fell down, and again hit his head on the bed rail. Later in the interview, Northcutt admitted that he shoved Mason both times Mason fell. After Mason fell against the bed rail the second time, Northcutt left Mason where he had fallen and walked out of the room. Northcutt returned to Mason's apartment the next day and found Mason dead.

Police interviewed Northcutt a second time after they interviewed his brother, John. In the second interview, Northcutt implicated his brother as a participant in the fight and stated that both he and his brother went to Mason's apartment with the intent to kill Mason. In explaining the events, Northcutt told police he left his house with rope that had a "gear shifting knob" attached to it. He described the knob as about the size and weight of a pool ball. After entering the apartment, Northcutt pulled Mason out of a chair, pushed him against a wall, and "conked" him on the head. Mason started screaming, and John increased the volume on the television to cover the sound. The fight continued as Mason attempted to run away from Northcutt. Northcutt admitted to hitting Mason twice in the back of the head and to punching Mason in the chest.

Another version of events was offered by Northcutt during his trial, which was separate from his brother's trial. In testifying in his own defense, Northcutt told the jury that he and Mason spent the

day of March 15 together, riding in Mason's car, going to a lake, and getting drunk. Sometime during their outing, Mason fell off a boat dock and cut his arm, and Northcutt helped him put a bandage on it. They returned to Mason's apartment around 3 p.m. so Mason could go to the bank and get $500 he owed to Northcutt. When they arrived at the apartment, Mason went inside, and Northcutt walked three blocks to his mother's house.

Defense counsel asked Northcutt about the problems between Mason and Northcutt and between Mason and John. Northcutt testified that there were issues between John and Mason concerning rent and utilities. As for Northcutt's situation, he testified that in addition to loaning money to Mason, he had loaned his expensive camera equipment to Mason around 1986 or 1987, and Mason had told him it had been stolen. Northcutt estimated the value of the equipment as around $30,000. On March 15, John called Northcutt and informed Northcutt that Mason was using Northcutt's supposedly stolen camera. Northcutt testified that he told his brother that if Mason has "got my camera I wanted to get it back, and if he's taking pictures of me, I said I'm going to kick his butt." The brothers also talked about the disagreement between Mason and John regarding rent and utility payments. Northcutt testified:

"I told John, I said well, I would confront [Mason] about it, but I said that's really none of my concern, that's between you and him. John wanted to move out and I said well, you can't move over here. . . . . I'll let you park your bags over here if you want, but as far as that, I said I'll confront [Mason] about certain issues, you know, and if you want, you know, because John's kind of scared to talk to him."

When Northcutt made this offer, John reported that Mason was not at the apartment. Northcutt told John to call him when Mason returned, which John did a short time later. Northcutt immediately went over to Mason's apartment.

Northcutt rode his bicycle and brought with him a climber's "impelling rope" that he routinely used to suspend his bicycle in trees to prevent it from getting stolen. This impelling rope, according to Northcutt, was about 18 inches long, had a clip, and had a gearshift knob on one end for weight. The impelling rope was attached to a longer rope that was about 35 feet long. When he arrived at Mason's residence, he discovered the branches on the

trees were too tall to reach, so he could not hang his bicycle. He put the bicycle under the back porch and carried the impelling rope inside.

Northcutt testified that he came up behind Mason, who was sitting at the computer, and "kind of kicked him in the butt" and asked if he had his camera. At that point, Mason jumped up, bringing some computer cords with him. The two men got "tangled up" in the cords. Northcutt said his impelling rope got wrapped around Mason's hand, so he tried to unwrap it. But, according to Northcutt, Mason was "half drunk" and kept pulling at the impelling rope at the same time Northcutt was working on it, which caused the heavy ball to keep hitting both of them. They got untangled, but Mason started "yelling and screaming" because the bandage ripped off his arm in the struggle and his cut was bleeding. At that point, John came into the room and turned up the volume on the television.

The arguing continued, and Northcutt tried to "chase them around" the apartment in an attempt to bandage Mason's arm. Eventually, Mason sat at the kitchen table but then ran to his bedroom. Northcutt followed and when he opened Mason's bedroom door, Mason pulled Northcutt's hand. Their hands slipped apart, and Mason fell backwards, hitting his head on the bed railing. According to Northcutt, Mason's head was bleeding, so Northcutt told him to sit while Northcutt got a first aid kit. Mason tried to get up but fell again, hitting his head on the bed's footboard. Mason got on the bed, saying, "I just want rest." At that point, Northcutt left the apartment.

Northcutt testified that he returned to Mason's apartment the next day. John, who had spent the night at his girlfriend's house, arrived at the same time. The two went inside and found Mason dead. He was lying face down in the living room. Northcutt told the jury that he did not know what happened but thought people would think "I done something wrong" because of his fight with Mason the previous night. A couple of days later, Northcutt told John "we're going to have to do something" about Mason. They used some plastic and a moving dolly to transport Mason to the

bedroom floor. Sometime later, Northcutt decided to bury Mason behind their mother's house and leave town.

When asked by defense counsel if he intended to kill Mason, Northcutt testified, "No, I did not." He also denied conspiring with John to kill Mason and indicated that he did not know how Mason died.

Several other witnesses testified during the trial. Although most of this testimony relates to matters that are not at issue on appeal, some additional points are significant to our discussion, including police testimony that there was a large blood stain on the bedroom floor and a forensic pathologist's testimony regarding autopsy results. The pathologist testified he could not determine the cause of death because of the level of decomposition resulting from the body being wrapped in plastic for nearly a month before police uncovered the grave. Despite the decomposition, the pathologist could discern four head lacerations that were consistent with blows by a pool ball-sized object. These injuries by themselves were not necessarily fatal but could have been part of the "mechanism of death."

An additional witness' testimony provides circumstantial evidence relevant to our consideration, as will be more fully discussed. That witness—a neighbor who lived in the upstairs portion of the duplex—testified that she met John and Northcutt on the sidewalk and, about 10 minutes after entering her apartment, heard a loud argument coming from downstairs. She recognized the voices of John, Mason, and one or two others. She heard Mason tell John that he was going to kick him out of the apartment because John was not helping pay the rent. Then, the television downstairs got very loud, and a short time later she heard the slam of a door. From her apartment window she saw John driving away in Mason's car, screeching the tires as he left the driveway. This was unusual because Mason did not let others drive his car. The neighbor testified that this was the last time she saw Mason's car at the apartment.

After hearing Northcutt's various statements and the testimony of the other witnesses, a jury convicted Northcutt of premeditated first-degree murder and conspiracy to commit first-degree murder.

For the murder conviction, the journal entry of sentencing reflects a term of life imprisonment with no possibility of parole for 25 years and a concurrent term of 117 months' imprisonment for the conspiracy. Northcutt appeals.

## SUFFICIENCY OF CONSPIRACY EVIDENCE

First, Northcutt contends there was insufficient evidence to support his conviction for conspiracy to commit first-degree murder. In reviewing the sufficiency of the evidence, an appellate court reviews all the evidence, viewed in a light most favorable to the prosecution, to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. See *State v. Richardson*, 289 Kan. 118, 127, 209 P.3d 696 (2009); *State v. Gutierrez*, 285 Kan. 332, 336, 172 P.3d 18 (2007).

To meet this standard, there must be evidence supporting each element of the conspiracy charge, which the State alleged was based on Northcutt and John knowingly and willfully "enter[ing] into an agreement with each other to commit or assist in the commission of a crime, to-wit: First-Degree Murder, as defined in K.S.A. 21-3401, and in furtherance of such agreement . . . kill[ing] David Mason by striking him in the head with a hard object several times until he died."

Thus, to establish that Northcutt had committed the crime of conspiracy to commit first-degree murder, the State was required to prove (1) that Northcutt agreed with John to commit or assist in the commission of the crime of first-degree murder; (2) that he agreed with the intent that the crime be committed; (3) that Northcutt or John acted in furtherance of the agreement; and (4) that this act occurred on or about March 15, 2006, in Wyandotte County, Kansas. See K.S.A. 21-3302; *State v. Webber*, 260 Kan. 263, 288, 918 P.2d 609 (1996); Pattern Instructions for Kansas Crim. 3d 55.03. To prove these elements under Kansas law, the existence of an agreement does not need to be proved directly. "[I]t is enough if the parties tacitly come to an understanding in regard to the unlawful purpose, and this may be inferred from sufficiently significant circumstances." *State v. Swafford*, 257 Kan.

1023, 1040, 897 P.2d 1027 (1995); see *State v. Sharp*, 289 Kan. 72, 105, 210 P.3d 590 (2009).

The record includes evidence to support each of these elements. Northcutt's testimony at trial revealed an express agreement between the brothers. As quoted above, Northcutt told his brother he would confront Mason about the rent because John was "scared" to talk to Mason about it. Further, the brothers agreed that John would let Northcutt know when Mason returned to the apartment, indicating an express acceptance of Northcutt's offer. In addition to this direct evidence of an agreement, there are several pieces of circumstantial evidence, including the fact that John met Northcutt outside the apartment (indicating a plan) and the neighbor overheard an argument about rent (indicating that plan was implemented).

Moreover, there is evidence of an agreement to kill Mason. Direct evidence of this agreement comes from Northcutt's second interview with police in which he repeatedly admitted that he went to the apartment with the intent to kill Mason. In addition, at one point during the interview, Northcutt stated that both he and John went to the apartment to kill Mason. Further, there is supporting circumstantial evidence. For example, Northcutt brought a homemade weapon with him into the apartment, despite Northcutt's testimony that he usually left it on his bicycle. Then, when Mason began to scream, John increased the volume on the television, an act which suggests he knew the fight and the screaming were going to continue. Further, although vague and conflicting, Northcutt made statements indicating John "may have" helped to hold Mason while Northcutt hit him repeatedly, including landing severe blows to Mason's head. Regardless of the ambiguity regarding the level of John's participation in the beating, there was evidence that both brothers acted in furtherance of an agreement to kill Mason.

In summary, there is evidence that Northcutt and John agreed to kill Mason, they planned a confrontation, Northcutt armed himself with a weapon, they met outside the apartment before beginning the confrontation, they assisted each other in the commission of the crime, and Mason died as a result of their premeditated actions. This evidence, when viewed in a light most favorable to

the prosecution, is sufficient to support a conclusion that a reasonable factfinder could find beyond a reasonable doubt that Northcutt conspired with John to commit first-degree murder.

## LESSER INCLUDED OFFENSE OF VOLUNTARY MANSLAUGHTER

Next, Northcutt argues that the trial court erred in refusing to instruct the jury on voluntary manslaughter as a lesser included offense of premeditated first-degree murder. The court did instruct on second-degree murder and involuntary manslaughter as lesser offenses but refused Northcutt's request to give a voluntary manslaughter instruction.

The legislature has established the parameters for when jury instructions on lesser included offenses should be given. K.S.A. 22-3414(3) provides in relevant part:

"In cases where there is some evidence which would reasonably justify a conviction of some lesser included crime as provided in subsection (2) of K.S.A. 21-3107 and amendments thereto, the judge shall instruct the jury as to the crime charged and any such lesser included crime."

Thus, we must examine the record to see if there is some evidence of each of the elements of voluntary manslaughter and, if so, if that evidence would reasonably justify a conviction for voluntary manslaughter. See *State v. Houston,* 289 Kan. 252, 276, 213 P.3d 728 (2009).

In arguing that the facts of the case meet this standard, Northcutt admits that a voluntary manslaughter instruction "does not completely fit with either party's theory of the case." Yet he argues the jury could have believed that the victim provoked a sudden quarrel when he stood up from the computer and entangled Northcutt in the computer cords, "causing a drunken fight to ensue." See K.S.A. 21-3403(a) (voluntary manslaughter defined to include intentional killing on "a sudden quarrel or in the heat of passion"); *State v. Arteaga,* 257 Kan. 874, 890, 896 P.2d 1035 (1995).

This argument ignores Kansas precedent that requires severe provocation to justify giving a voluntary manslaughter instruction. *E.g., State v. Vasquez,* 287 Kan. 40, 55-56, 194 P.3d 563 (2008); *State v. Gallegos,* 286 Kan. 869, 874, 190 P.3d 226 (2008); *State v. Drennan,* 278 Kan. 704, 713, 101 P.3d 1218 (2004); *State v. Horn,*

278 Kan. 24, 40-41, 91 P.3d 517 (2004). Under our precedent, mere evidence of an altercation between parties does not alone support finding sufficient provocation. *State v. Mitchell*, 269 Kan. 349, 353, 7 P.3d 1135 (2000); see *Gallegos*, 286 Kan. at 874-75 (holding evidence of argument between victim and defendant fails to demonstrate legally sufficient provocation for shooting victim).

In *Horn*, 278 Kan. 24, we reiterated these and other basic principles regarding the elements of voluntary manslaughter, stating in part that " '[a] provocation is adequate if it is calculated to deprive a reasonable man of self-control and to cause him to act out of passion rather than reason.' [Citation omitted.]" *Horn*, 278 Kan. at 40. The *Horn* court further explained that " '[t]he test of the sufficiency of the provocation is objective, not subjective. The provocation, whether it be "sudden quarrel" or some other form of provocation, must be sufficient to cause an ordinary man to lose control of his actions and his reason.' " *Horn*, 278 Kan. at 40 (quoting *State v. Guebara*, 236 Kan. 791, 796-97, 696 P.2d 381 [1985]).

Considering these rules, we conclude that even if the jury accepted that Mason stood up and became tangled in the computer cords and Northcutt's "impelling rope," such an action is not severe provocation; it is not an action that would cause an ordinary person to lose control of his or her actions and reason. Moreover, one consistency in all of Northcutt's various renditions of events was that Northcutt was the first one to push, shove, kick, lift, or hit. Even before the jury, Northcutt testified that he went into Mason's home, came up behind Mason, and "kicked him in the butt." Only then did Mason rise and become tangled in the cords. In other words, Northcutt provoked Mason's actions, not the other way around.

Because there is no evidence of provocation by Mason, much less severe provocation, the trial court was not required to instruct the jury on voluntary manslaughter. See *Vasquez*, 287 Kan. at 55-56 (stating that facts did not " 'meet the provocation threshold—that which is calculated to deprive a reasonable [person] of self-control and to cause [the defendant] to act out of passion rather than reason' "); *Gallegos*, 286 Kan. at 874-75 (holding evidence of argument between victim and defendant fails to demonstrate le-

gally sufficient provocation for shooting victim); *Drennan*, 278 Kan. at 711-13 (hitting someone's back during verbal argument not sufficient provocation).

Affirmed.