## THE STATE OF KANSAS V. JOHN KNOLL.
### No. 14,419.    (83 Pac. 622.)
#### SYLLABUS BY THE COURT.

MANSLAUGHTER—*Killing in an "Unusual" Manner Not Proved.*
The evidence in this case is legally insufficient to establish a
killing in an unusual manner, within the meaning of section
16 of the crimes act (Gen. Stat. 1901, § 2001), defining man-
slaughter in the second degree to be "the killing of a human
being without a design to effect death, in the heat of passion,
but in a cruel and unusual manner, unless it be committed
under such circumstances as to constitute excusable or justi-
fiable homicide."

Appeal from Ellis district court; JAMES H. REEDER,
judge. Opinion filed November 11, 1905. Reversed.

*C. C. Coleman,* attorney-general, and *E. A. Rea,*
county attorney, for The State.

*W. E. Saum,* and *A. D. Gilkeson,* for appellant.

The opinion of the court was delivered by

BURCH, J.: The defendant was convicted of man-
slaughter in the second degree under section 16 of the
crimes act, which reads as follows:

"The killing of a human being without a design to
effect death, in the heat of passion, but in a cruel and
unusual manner, unless it be committed under such
circumstances as to constitute excusable or justifiable
homicide, shall be deemed manslaughter in the second
degree." (Gen. Stat. 1901, § 2001.)

In this appeal it is urged that the evidence wholly
fails to sustain the verdict and judgment. The facts
are few, simple, and, so far as the decisive circum-
stance is concerned, undisputed. They are outlined in
a general way in the opinion of this court rendered
upon a former appeal, in the case of *The State v.
Knoll,* 69 Kan. 767, 77 Pac. 580. To the statement
there made it is, however, necessary to add a few par-
ticulars.

The deceased was a small man, not very stout, in poor health, and a hunchback. The defendant was a much larger and stronger man. The deceased had a revolver, but made no attempt to use it. The defendant, who was unarmed, defied the deceased to shoot; and then grappled him and bore him to the floor. While upon the deceased he choked him and beat him with his fists until they were bloody. After the encounter the deceased was found to have a bruised and bleeding eye, a bruise on the back of his head, bruises on his breast, an abrasion on his back—which, however, was probably a bed-sore—and the tibia of his left leg was broken.

A daughter of the deceased described the onset as follows: "Then Knoll jumped up and grabbed my papa . . . and rolled him on the floor." The wife of the deceased gave the following testimony:

"They pushed me away, and then Alex and Knoll got together in the dining-room there, in the store. I seen Alex had a revolver, and I said, 'Alex, give me the revolver,' and he says, 'No, I won't,' and Knoll says, 'Shoot me if you can.' I guess that is how it was; and then they grabbed some way, and I run to the door then to see is this help coming. . . . I motioned for them to hurry up, and in this time little Anna says, 'Mamma, mamma, he has got my papa down; he is choking him.' And I run through, and sure enough, there lay the revolver in the corner, and I seen right away that it was n't discharged. Knoll was on Alex, and I gave Knoll a push away, and Alex says, 'My leg is broke.' 'Now,' he says, 'Sponsor, what have you done? You have broke my leg—look at me.' The blood was running from his face, and his leg was broke."

She explained the breaking of her husband's leg thus:

"Where the scuffle was there is a counter; and it has a scantling underneath the counter, and my idea is that he was against the counter this way [illustrating], and he got that leg in there some way, and he pushed him down—threw him down—and twisted that leg off, and John fell on him."

She further said that she would call it a wrestle at first; that they both staggered; that her husband had been drinking; and that Knoll was "bad drunk." The defendant's own account of the occurrence was as follows:

"Then he went up-stairs and got his gun. I says, 'Alex has gone to get his gun,' and she says, 'No, he won't shoot.' The house was north and south, and he turns around with his face to the south, and held up the revolver and says, 'Now, what are you going to do?' And I says, 'Shoot, shoot.' He did n't say anything more, but he swore like everything. And then— I don't know just how it happened—but we grabbed, and I grabbed his left arm this way, and he had the gun this way with this hand, and we grabbed and fell down, and the gun flew away, and Mrs. Denning grabbed the gun; and he tried to hit me, and I got his hands and held them, and says, 'Now will you quit?' And he says, 'No, not for any ———— ————,' and I grabbed his arms so, and crossed them on his breast, and I hit him in the face and in the eye. Then I asked him if he got enough, and he says, 'Yes, I give up'; and Mrs. Denning came and says, 'John, that is enough now. What have you done? You have broke Alex's leg.' "

As stated in the former opinion, "Denning was suffering from chronic alcoholism and fatty degeneration of the heart. In consequence of his injury he was put to bed, and by reason of the inactivity thus enjoined, and his previous diseased condition, self-infection resultant from the inability properly to throw off the natural secretions ensued; from which complication he died on the 23d of March, thirty-two days after his injury. While his physical condition prior to his injury was such as would have eventually resulted in his death, the injury which he received hastened that result." (69 Kan. 769.) These facts show clearly enough a homicide committed in the heat of passion, without a design to effect death, and without excuse or justification. But was the killing done "in a cruel and unusual manner"?

There is, of course, no fixed standard, either of

cruelty or of wontedness of manner, by which homicides may be measured, and yet the legislature evidently attached much meaning to the distinction which it indicated by the use of the words quoted. By section 26 of the crimes act (Gen. Stat. 1901, § 2011) the involuntary killing of another in the heat of passion by means neither cruel nor unusual is made manslaughter in the fourth degree. The punishment for manslaughter accomplished in a cruel and unusual manner is confinement and hard labor in the penitentiary for not less than three nor more than five years, while that for manslaughter by means neither cruel nor unusual is confinement and hard labor in the penitentiary not exceeding three years, or by imprisonment in the county jail for not less than six months. Cruelty and an unusual manner are therefore vital and essential elements of manslaughter in the second degree. To be such, however, they cannot be discovered in the common pitilessness and pain attending homicides generally, nor in the departure from ordinary use involved in turning common weapons or common instruments or methods of accomplishment to the killing of human beings. Fatal shootings and stabbings and poundings, mutilations of flesh and fractures of bones are all cruel enough, and they cannot be said to represent the usual demeanor of men; hence something more must have been intended. Special stress and emphasis must be imposed upon the words used in order to accomplish the legislative purpose, and this may be done without departing from their ordinary signification, since they are comparative terms susceptible of variant shades of meaning.

It must be said, therefore, that in order to constitute manslaughter in the second degree there must be some refinement or excess of cruelty sufficiently marked to approach barbarity, and to make it especially shocking; and the unusual character of the manner displayed must stand out sufficiently peculiar and unique

to create surprise and astonishment, and to be capable of discrimination as rare and strange.

"In a sense, every killing may be said to be cruel, and killings may be said to be unusual, but surely it was not in this sense the legislature used the terms, for, if so, they add no meaning to the section. It is not difficult to conceive the idea of a killing in the heat of passion that would be cruel or unusual, but within it would never be embraced the instance of one who in the heat of passion in the course of angry altercation struck a single fatal blow with an ordinary working implement which he had in his hand at the commencement and during the entire progress of the altercation." (*The State v. Wilson,* 98 Mo. 440, 447, 11 S. W. 985, 987.)

In the case of *Schlect v. The State,* 75 Wis. 486, 44 N. W. 509, the defendant, who shot his antagonist with a pistol, was convicted of manslaughter in the fourth degree under a statute defining that crime as "the involuntary killing of another by any weapon, or by any means, neither cruel nor unusual, in the heat of passion, in any cases other than such as are herein declared to be justifiable or excusable homicides."

The court said:

"There are three ingredients of the offense, which, concurring, are supposed to distinguish this one from any other criminal homicide. They are: (1) Involuntary; (2) a weapon neither cruel nor unusual; and (3) the heat of passion. . . . What is a cruel weapon we need not define. If a pistol is a cruel weapon, then any weapon that is most likely to take life, or commonly used to take life, is a cruel one, and all weapons are cruel. It must be some other than such a common weapon that can be distinguished as cruel. It is a usual weapon, or not unusual. This is evident."

On the other hand, a lighted kerosene lamp full of oil has been declared to be undeniably a weapon or means both cruel and unusual. (*Bliss v. State,* 117 Wis. 596, 607, 94 N. W. 325.)

In the facts of this case it is somewhat difficult to

16—72 KAN.

discover a sufficient viciousness of mind on the part of the defendant, and a sufficiently grievous effect upon the deceased, to amount to that cruelty which the statute requires. Although severe pain was inflicted without necessity, and although there was not merely an indifference to such pain but a certain savage pleasure in causing it, still there is no more atrocity and no more peculiar or extreme agony than might be exhibited in, and result from, any drunken brawl.

Conceding, however, as upon the whole it is probably wisest to do, that the spectacle of a burly, drunken bully crushing to the floor a weak and sickly cripple, snapping a bone and mauling his flesh, is too revolting to pass for less than that extreme cruelty which the law contemplates, the court is unable to say that the manner in which it was accomplished was unusual. Nothing but unaided bodily strength and energy, used according to the common custom of fighting men, appears. The fact that a leg was broken does not change the character of the means employed to break it. Death must always result to complete the crime, and if the deceased's back or neck had been broken, or his body had been crushed by his fall or as a result of his beating, the circumstance would not have changed the character of the offense, unless perhaps the force displayed had been so tremendous as to become phenomenal. Such an exhibition could scarcely occur with those staggering, wallowing drunkards. If, therefore, the manner of the killing in this case could be said to present an instance of such aggravated cruelty as to amount to brutality, it nevertheless occurred after the ordinary manner in which brutishness is made manifest; and, since both cruelty and unusualness must be proved, the defendant was not shown to be guilty of the crime of manslaughter in the second degree. In the case of *State v. Linney,* 52 Mo. 40, 42, it was said:

"We know no standard by which the court could define what constitutes cruel or unusual killing. Every killing is generally cruel, and there is no definite or

The State v. Knoll.

usual manner of performing the act that I am aware of. Therefore, it is a subject that must be left to the jury to be determined by the testimony in the case."

After the decision in *The State v. Wilson*, 98 Mo. 440, already quoted, this statement can scarcely any longer be the law, since the same court there undertook to declare a meaning for the statute and to hold a given state of facts to be without that meaning. In the case last referred to the court did no more than discharge its plain duty. Juries are not interpreters of statutes. Their function is to determine what testimony proves. By the statute under consideration the legislature has fixed a standard by which the criminality of killings is to be measured. The meaning of that statute this court is bound to know and to pronounce; and, when a given state of facts is proved, it is under the further obligation to say whether those facts are legally sufficient to meet the requirements of its definition. If the evidence be circumstantial in its character, or if it be conflicting and may be made the basis of different inferences, the court cannot interfere; but such is not this case. The court must here declare whether a killing in an unusual manner is shown, precisely the same as it was obliged to declare whether deliberation and premeditation had been proved in the case of *Craft v. The State of Kansas*, 3 Kan. 450, and whether murder in the second degree had been established in the case of *The State v. Diebolt*, 54 Kan. 129, 37 Pac. 992.

If upon another trial the facts should be substantially similar to those presented by this record, instructions under both sections 26 and 27 of the crimes act (Gen. Stat. 1901, §§ 2011, 2012) ought to be given, since the question of cruelty is a difficult one, and the defendant should be allowed the benefit of any reasonable doubt.

The judgment is reversed and the cause remanded.

Greene, Mason, Smith, Porter, Graves, JJ., concurring.

JOHNSTON, C. J. (dissenting): The manner of the killing is an element of the offense, and is a question of fact for the determination of a jury. The jury did decide that the manner of the killing was both cruel and unusual, and a majority of the court approve of the finding that it was cruel. If there was testimony fairly tending to show that the method of the killing was unusual, it was the duty of the court to submit the question to the jury, and its verdict should not be set aside. In this state homicides are uncommon, and it is not easy to define the usual manner in which unlawful killings are committed. In almost every case it must necessarily be a question for the jury to determine. The act of a large, robust man attacking a weak and sickly cripple, choking him, beating him on the face and body, and twisting his leg off, as one of the witnesses described it, is sufficiently unique in manner to make it a jury question as to whether or not it is a usual or an unusual killing. I am, therefore, of the opinion that there was sufficient testimony to take the question to the jury, and that its verdict should be upheld.