No. 44,114

State of Kansas, *Appellee*, v. Harvey Lee Diggs, *Appellant.*

(402 P. 2d 300)

Opinion filed May 15, 1965.

*Harry L. Depew,* of Neodesha, argued the cause, and was on the brief for the appellant.

*B. D. Watson,* County Attorney, argued the cause, and *Robert C. Londerholm,* Attorney General, and *Monte K. Heasty,* Assistant County Attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

Schroeder, J.: This is a criminal action against the defendant under G. S. 1949 (now K. S. A.) 21-407, manslaughter in the first degree, charging that the defendant struck several blows with his fists to the face and body of Harry Kepner which caused his death five days later. The case was tried to a jury which found the defendant guilty of manslaughter in the second degree, and appeal has been duly perfected to this court.

The controlling question is whether the jury was correctly instructed concerning manslaughter·in the second degree under the evidence adduced in the case.

The portion of instruction No. 5 given by the trial court, which the appellant challenges as being clearly erroneous under the evidence, reads:

"No. 5.

"The sections of the statutes of Kansas, defining the crimes and offenses charged as above stated, and which will be pertinent to your consideration of the evidence in this case, insofar as they are applicable, read as follows:

.    .    .    .    .    .    .    .    .    .    .    .    .

" 'G. S. [now K. S. A.] 21-411. *Manslaughter in the second degree.* The killing of a human being without a design to effect death, in the heat of passion, but in a cruel and unusual manner, unless it be committed under such circumstances as to constitute excusable or justifiable homicide, shall be deemed *manslaughter in the second degree.*' "

In 1905 in the case of *State v. Knoll,* 72 Kan. 237, 83 Pac. 622, the conviction of a defendant of manslaughter in the second degree under section 16 of the crimes act (G. S. 1901, § 2001), defining manslaughter in the second degree as above quoted by the trial court (21-411, *supra*), was reversed on the ground the evidence in the case was legally insufficient to establish a killing in an unusual manner.

There the deceased was a small man, not very stout, in poor health, and a hunchback. The defendant was a much larger and stronger man. The deceased had a revolver, but made no attempt to use it. The defendant, who was unarmed, defied the deceased to shoot, and then grappled him and bore him to the floor. While upon the deceased he choked him and beat him with his fists until they were bloody. After the encounter the deceased was found to have a bruised and bleeding eye, a bruise on the back of his head, bruises on his breast, and the tibia of his left leg was broken.

There the deceased was suffering from chronic alcoholism and fatty degeneration of the heart. In consequence of his injury he was put to bed, and by reason of the inactivity thus enjoined, and his previous diseased condition, self-infection resultant from the inability properly to throw off the natural secretions ensued; from which complication he died thirty-two days after his injury. While his physical condition prior to his injury would eventually have resulted in his death, the injury which he received hastened that result.

These facts were said to clearly show that a homicide was committed in the heat of passion without a design to effect death and without excuse or justification. But it was held the killing was not done "'in a cruel and unusual manner.'" (p. 239.) In so holding the court said:

"There is, of course, no fixed standard, either of cruelty or of wontedness of manner, by which homicides may be measured, and yet the legislature evidently attached much meaning to the distinction which it indicated by the use of the words quoted. By section 26 of the crimes act (Gen. Stat. 1901, § 2011) the involuntary killing of another in the heat of passion by means neither cruel nor unusual is made manslaughter in the fourth degree. The punishment for manslaughter accomplished in a cruel and unusual manner is confinement and hard labor in the penitentiary for not less than three nor more than five years, while that for manslaughter by means neither cruel nor unusual is confinement and hard labor in the penitentiary not exceeding three years, or by imprisonment in the county jail for not less than six months. Cruelty and an unusual manner are therefore vital and essential elements of manslaughter in the second degree. To be such, however, they cannot be discovered in the common pitilessness and pain attending homicides generally, nor in the departure from ordinary use involved in turning common weapons or common instruments or methods of accomplishment to the killing of human beings. Fatal shootings and stabbings and poundings, mutilations of flesh and fractures of bones are all cruel enough, and they cannot be said to represent the usual demeanor of men; hence something more must have been intended. Special stress and emphasis must be imposed upon the words used in order to accomplish the legislative purpose, and this may be done without departing from their ordinary signification, since they are comparative terms susceptible of variant shades of meaning.

"It must be said, therefore, that in order to constitute manslaughter in the second degree there must be some refinement or excess of cruelty sufficiently marked to approach barbarity, and to make it especially shocking; and the unusual character of the manner displayed must stand out sufficiently peculiar and unique to create surprise and astonishment, and to be capable of discrimination as rare and strange.

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"In the facts of this case it is somewhat difficult to discover a sufficient viciousness of mind on the part of the defendant, and a sufficiently grievous effect upon the deceased, to amount to that cruelty which the statute requires. Although severe pain was inflicted without necessity, and although there was not merely an indifference to such pain but a certain savage pleasure in causing it, still there is no more atrocity and no more peculiar or extreme agony than might be exhibited in, and result from, any drunken brawl.

"Conceding, however, as upon the whole it is probably wisest to do, that the spectacle of a burly, drunken bully crushing to the floor a weak and sickly cripple, snapping a bone and mauling his flesh, is too revolting to pass for less than that extreme cruelty which the law contemplates, the court is unable to say that the manner in which it was accomplished was unusual. Nothing but

unaided bodily strength and energy, used according to the common custom of fighting men, appears. The fact that a leg was broken does not change the character of the means employed to break it. Death must always result to complete the crime, and if the deceased's back or neck had been broken, or his body had been crushed by his fall or as a result of his beating, the circumstance would not have changed the character of the offense, unless perhaps the force displayed had been so tremendous as to become phenomenal. Such an exhibition could scarcely occur with those staggering, wallowing drunkards. If, therefore, the manner of the killing in this case could be said to present an instance of such aggravated cruelty as to amount to brutality, it nevertheless occurred after the ordinary manner in which brutishness is made manifest; and, since both cruelty and unusualness must be proved, the defendant was not shown to be guilty of the crime of manslaughter in the second degree. . . ." (pp. 239-242.)

A recent case decided by the New York Court of Appeals in 1949 (*People v. Vollmer,* 299 N. Y. 347, 87 N. E. 2d 291), cited *State v. Knoll,* supra, with approval, and held there was nothing "'cruel and unusual'" about the assault, for to be "'cruel and unusual'" the manner of a homicide must have in it some aggravating element, something out of the ordinary, something shocking or barbaric. It was said the phrase could not be applied where a flurry of blows from the defendant's fists sent the other man to his death.

The evidence in the instant case, using the appellee's version, which the appellant does not dispute, establishes the following:

Harvey Lee Diggs (defendant-appellant) resided at Coffeyville, Kansas, and was employed by the Western Union as a lineman. His wife, Irene, with whom he lived, drank heavily and was probably an alcoholic. Irene was acquainted with an elderly man named Harry Kepner since she was a young girl. Kepner was a long-time family friend, a retired man, 78 years of age, and lived alone in a house situated near the Diggs residence. Irene was 49 years of age and had the habit of visiting Kepner at his home on occasions. She usually walked to the residence of Kepner, and they would sit and talk or watch television. Occasionally, she took beer to Kepner's home, but Kepner never drank over one can or bottle of beer, and did not like whiskey. He would never become drunk.

Irene and the appellant, age 58, had a rather stormy marriage and many arguments took place between them over drinking. They argued over Irene's visits to Kepner's home. The appellant hit and struck her on many occasions and she was confined to the hospital at least twice as a result of these beatings.

On the afternoon of May 1, 1964, while the appellant and his son

by a previous marriage were at work, Irene went to the home of Kepner for a visit. When the appellant and his son came home Irene was not present. They drove to several beer halls or taverns looking for her, without avail. The appellant and his son drank a quantity of beer at the taverns. They then drove to the Kepner residence and parked about a block away. The appellant told his son to stay in the vehicle, that he had some business to take care of and that it was not his son's affair. When he arrived at Kepner's house, the screen door was hooked, but he jerked the screen door open, breaking the lock, and entered the house. He found his wife and Kepner sitting in the front room of the house watching television. The appellant started cursing and commenced striking his wife around the face and head with his hands and fists. After striking her several times, he turned to Kepner, who was then standing erect. He began striking Kepner around the face and head with his fists. As the appellant began striking Kepner, Irene arose from her chair and fled. As she left the house she heard Kepner say, "oh, oh, please don't hit me, don't hit me." She heard him say this several times as she was fleeing from the house. She testified that her husband struck the first blows and that she never saw Kepner strike him in any way, nor did she see Kepner attempt to defend himself.

The appellant testified in his own behalf and stated that he was mad at the time he entered the house; he admitted striking his wife several times; and that he then began striking Kepner. The appellant testified he struck Kepner three or four times with his fists; that at no time did Kepner strike him, nor in any way did Kepner try to defend himself. He further testified that when he hit Kepner with his fists Kepner staggered back and fell into a sitting position in a chair. The evidence was that the appellant used nothing but his hands and fists in beating Kepner.

The appellant's son testified that he arrived at Kepner's house when the fight between his father and Kepner was over. That Kepner was standing in the middle of the room and Irene was gone. He further stated that Kepner was crying when he entered the room, and it was evident that Kepner had received a beating.

The evidence was that Kepner was a peaceful man and did not argue with anyone.

The following day Irene went to Kepner's residence and asked him not to prefer charges against her husband, and Kepner agreed. Kepner was not feeling well, and on May 3, 1964, went to the hospital. He was suffering from a massive hemorrhage and died a day or so later without leaving the hospital.

The medical evidence was that Kepner died of a massive hemorrhage caused by a ruptured esophagus; that when he entered the hospital he had bruises and contusions about his face and body; that he had broken ribs; that both eyes were very blackened and swollen. An autopsy confirmed the cause of death. The medical testimony was that the rupture of the esophagus of the decedent was caused by the beating he received on May 1, 1964, and that he died as a direct result of that beating.

The appellee contends this court in *State v. Williams*, 182 Kan. 468, 322 P. 2d 726, overruled *State v. Knoll*, supra, by adopting the language used in the dissenting opinion of the *Knoll* case. The appellee argues the defendant in the *Williams* case used only his fists to beat the deceased while incarcerated in the bull pen of the police station at Junction City, Kansas.

The facts in the *Williams* case disclose that the deceased, while still handcuffed in the bull pen, was attacked by the defendant, who not only struck the handcuffed decedent several times with his fists, but also kicked him after knocking him down and into the shower stall. The fight did not end until the decedent had been knocked into the shower stall and " 'didn't come back no more.' " (p. 469.) He was found dead in the shower stall.

We think the facts in the *Williams* case are sufficient to distinguish it from those in the instant case.

We adhere to the decision in *State v. Knoll*, supra, and think the facts in the instant case present a stronger case for the reversal of a conviction of manslaughter in the second degree than the facts in the *Knoll* case.

The evidence in this case did not warrant the giving of an instruction on second degree manslaughter under 21-411, *supra.*

It has been held the court must examine the evidence as a whole and then instruct upon such questions as the evidence naturally, reasonably and probably tends to prove. It cannot properly instruct as to any degree of the offense which the evidence does not tend to prove. (*State v. Hardisty*, 121 Kan. 576, 249 Pac. 617, and authorities cited therein.)

In *State v. Noble,* 175 Kan. 398, 264 P. 2d 479, it was held there was no occasion to instruct on manslaughter in the second degree (G. S. 1949, 21-412) under the evidence, there being no unlawful act shown. Similarly, in *State v. Linville,* 148 Kan. 142, 79 P. 2d 869, it was held the essential elements to constitute the crime of manslaughter in the second degree specified in the statute—the killing of a human being without design to effect death in the heat of passion and in a cruel and unusual manner—were neither established by direct evidence nor by legitimate inference, and a conviction pursuant to an instruction thereon was reversed.

An instruction given to the jury by the trial court should be based upon the evidence in the case. Where the facts on the point are simple, and there is no dispute in the testimony, the question is one purely of law, although arising in a criminal case, and it is exclusively for the court to determine.

Accordingly, we hold the giving of an instruction on manslaughter in the second degree under 21-411, *supra,* on the evidence adduced in the instant case was clearly erroneous, and the appellant should be granted a new trial. In view of our decision, other points presented by the appellant become immaterial.

The judgment of the lower court is reversed with directions to grant a new trial.

Fontron, J., dissenting: I find myself in disagreement with the court's opinion. Although I acknowledge that the decision in *State v. Knoll,* 72 Kan. 237, 83 Pac. 622, may provide a precedent for the majority's holding, I am unable to accept the rationale of that decision. The view expressed by Chief Justice Johnston, in his able dissenting opinion in *Knoll,* strongly appeals to me as being grounded in reason and good, common sense.

I find no better words in which to phrase my sentiments than to quote from Judge Johnston's logical and concise dissent:

"The manner of the killing is an element of the offense, and is a question of fact for the determination of a jury. The jury did decide that the manner of the killing was both cruel and unusual, and a majority of the court approve of the finding that it was cruel. If there was testimony fairly tending to show that the method of the killing was unusual, it was the duty of the court to submit the question to the jury, and its verdict should not be set aside. In this state homicides are uncommon, and it is not easy to define the usual manner in which unlawful killings are committed. In almost every case it must necessarily be a question for the jury to determine. . . ." (p. 244.)

There is evidence in the instant case of a brutal and unprovoked attack upon a peaceful old man of seventy-eight, who offered no resistance, by a quarrelsome tough who was twenty years younger than his victim. There is evidence that, although he used only his hands and fists, the aggressive bully continued to beat and flail the old gentleman about the head and body despite the latter's repeated pleas to stop. There is evidence that so savage was the attack that its victim was knocked into a chair and sustained not only a ruptured esophagus, which caused his death, but also bruises and contusions about the head and body, badly blackened and swollen eyes and broken ribs.

Considering the disparity in age between the assailant and the assailed, the defendant's attack upon the deceased would appear to be sufficiently unique in its ferocity, duration and manner of accomplishment to make it a jury question as to whether the killing was cruel or not, and whether it was usual or unusual.

In my opinion, the judgement of the lower court should be affirmed and I, therefore, respectfully dissent.