No. 110,352

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JESSIKA D. GOODING,
*Appellant*.

SYLLABUS BY THE COURT

1.

When the sufficiency of evidence is challenged in a criminal case, an appellate court reviews such claims by looking at all the evidence in a light most favorable to the prosecution and determining whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. In determining whether there is sufficient evidence to support a conviction, the appellate court does not reweigh the evidence or the credibility of witnesses.

2.

The Kansas Supreme Court has stated that in order to justify instructing the jury on the lesser included offense of voluntary manslaughter arising from a sudden quarrel or heat of passion, there must be severe provocation. The provocation, whether it be a sudden quarrel or some other form of provocation, must be sufficient to cause an ordinary person to lose control of his or her actions and reason. Mere words or gestures, however insulting, do not constitute adequate provocation, but insulting words when accompanied by other conduct, such as assault, may be considered. Similarly, mere evidence of an altercation between parties does not alone support a finding of sufficient provocation to justify instructing the jury on voluntary manslaughter as a lesser included offense.

1

3.

       *State v. Harris*, 27 Kan. App. 2d 41, 998 P.2d 524 (2000), is distinguished and does not apply to uphold the defendant's voluntary manslaughter conviction under the facts of this case.

       Appeal from Sedgwick District Court; BENJAMIN L. BURGESS, judge. Opinion filed October 3, 2014. Reversed and remanded with directions.

       *Adam D. Stolte*, of Kansas Appellate Defender Office, for appellant.

       *Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, C.J., LEBEN and ATCHESON, JJ.

       MALONE, C.J.:  Jessika Gooding appeals following her conviction of one count of voluntary manslaughter. Gooding claims:  (1) there was insufficient evidence of a sudden quarrel to convict her of voluntary manslaughter; (2) the district court erred in instructing the jury on the definition of "knowingly"; (3) the district court erred in failing to consider her ability to pay the Board of Indigent Defense Services (BIDS) application fee; and (4) the district court violated her constitutional rights when it imposed an increased sentence based upon her prior criminal history without requiring the State to prove the criminal history to a jury beyond a reasonable doubt.

       We agree with Gooding that under the facts of this case, there was insufficient evidence of a sudden quarrel to support her conviction of voluntary manslaughter. We also agree with Gooding that without sufficient evidence of a sudden quarrel between her and the victim, there is no legal basis to uphold her voluntary manslaughter conviction even if the evidence may have been sufficient to support a conviction of intentional

second-degree murder. Thus, we reverse the district court's judgment and remand with directions to discharge Gooding.

FACTUAL AND PROCEDURAL BACKGROUND

On the morning of January 7, 2012, Gooding was preparing to visit several rental properties with her boyfriend, Christopher Mills. Gooding had arranged to meet with the landlord of one of those properties that morning—the earlier the better. She and Mills had spent the night at the home of Gooding's mother, located five or six houses north of the intersection of Santa Fe and Kinkaid Street in Wichita. Gooding was ready to go before Mills. She went outside to start her car, which was parked on Santa Fe in front of the house. As Gooding sat in the car, she saw Mills emerge from the house wearing a tank top. Concerned about the "chilly" temperature and Mills looking presentable for the meeting with the landlord, Gooding told him to go back inside the house and put a sweater on if he was going to accompany her to the rental property.

Mills was in a "grumpy" mood, and when he turned and re-entered the house, he shut the screen door and front door. Gooding interpreted this as a sign that Mills was not going to come with her; she figured he was going back to bed. Gooding began driving toward the intersection of Santa Fe and Kinkaid Street, where she stopped at a stop sign. While stopped at the intersection, Gooding heard Mills yelling at her to wait. Gooding later testified that Mills was not being kind or reasonable.

Mills approached Gooding's car. He was standing close to the passenger's side of the vehicle "right on the curb area," looking in the window and gesturing with his hands. Gooding testified that she, too, was gesturing with her right hand and beckoning Mills to "come on" and get in the car. As this was happening, Gooding noticed a man in an SUV drive by. She testified that Mills was "cussing [her] out," acting belligerently, and waving his arms. Gooding said she just wanted him to calm down so they could go.

3

The parties dispute what happened next. Gooding testified that Mills was "hyped up" and upset that she had left him at her mother's house. He was walking back and forth between Gooding's car and the grassy easement next to the curb. Gooding decided that she would just "get out of there" because it was obvious to her that Mills was mad and did not intend to go with her. Gooding turned the corner and started driving west on Kinkaid Street. Mills initially continued to run back and forth between Gooding's car and the easement, but then he started walking away—"kind of cooling down."

At this point, Gooding said that she pulled up a little behind Mills and again told him to come on and get in the car. Gooding was in the driver's seat with her left hand on the steering wheel and her right hand extended out toward Mills. She was leaning toward the passenger's side window in order to see Mills' face. Gooding testified: "When I was sitting like this and I was leaning in, my whole body shifted towards [Mills] and my foot accidentally pressed on the accelerator and my left hand went towards [Mills]." Gooding testified that she accidently hit Mills with the car.

The State provided a different account, based on the eyewitness testimony of D'Andre Thomas. Thomas was the driver of the SUV that drove eastward on Kinkaid Street past Gooding and Mills while Gooding's car was stopped at the intersection of Santa Fe and Kinkaid Street. As Thomas approached the intersection, he saw a man standing outside of a car on the grass waving both of his hands. Thomas testified that the man "[l]ooked like he was arguing with somebody inside the car."

As Thomas drove closer, he saw that there was a woman inside the car. The man was standing away from the car, but he was talking to the woman through the passenger's side window. As Thomas approached, he saw the woman "swing the car" like she was trying to hit the man on the grass. The car "made a quick swing as if it was going to jump the curb right there where he was." However, the car did not jump the curb at that point. When the car made the jerking motion, the man jumped back further onto the grass.

4

Thomas continued to watch through his rearview mirror as he drove east on Kinkaid Street. The car at the intersection stopped for a moment, and the man turned around and started walking west on Kinkaid Street. The car turned west onto Kinkaid Street and started following the man as he walked on the grass. Thomas said the man never stepped into the street and he did not appear to be communicating with the woman in the car. Thomas testified that the man "was just walking like he was trying to get away from [the car]." According to Thomas, the car slowly followed the man before it sped up, jumped the curb, and hit him. The man flipped into the air and onto the car before rolling off into the grass. Thomas testified that he never saw any brake lights on the car.

The parties generally agree on the events that took place immediately after Mills was struck. When Thomas saw the car strike Mills, he shifted his vehicle into reverse and drove back toward the scene. Thomas saw Gooding get out of her car, run around to where Mills was lying in the grass, and start shaking him as if she were trying to see if he was okay. Gooding ran up to Thomas' car and started yelling, "I need a phone, I need to use the phone, we were fighting, we were arguing." Thomas ran to check on Mills. He had blood on his face and there was blood running out of his ears. Eventually, Gooding retrieved her own phone from her car and called 911. Thomas took over the 911 call because Gooding was hysterical and incoherent.

Officer Daniel Brown of the Wichita Police Department was the first law enforcement officer to arrive at the scene. Thomas contacted Brown and identified himself as the man who had called 911. Thomas told Brown that he had seen Gooding and Mills arguing and that Gooding ran over Mills. Officer Michael O'Brien also arrived at the scene. O'Brien testified that Gooding was distraught and crying. O'Brien instructed Gooding to sit in the back of his patrol car while he waited for a female officer to arrive to conduct a search of her person. As Gooding sat in the car, she asked O'Brien whether Mills was going to be okay. She told O'Brien that Mills "jumped out in front of me."

5

Emergency responders transported Mills to the hospital. Trauma physicians determined that Mills was unresponsive and called Dr. John Dickerson, the on-call neurosurgeon. Dickerson testified that Mills had a traumatic brain injury, as well as other abrasions, lacerations, and bruising on his extremities. Upon his initial examination of Mills' head injury, Dickerson noted a lot of swelling. A CT scan revealed a depressed skull fracture that wrapped all the way around Mills' head, centering on the right side.

Dickerson performed a decompressive craniectomy in response to severe swelling in Mills' brain. However, Mills' medical condition never improved. Based on the treatment administered and his own observations, Dickerson opined that Mills had sustained an unrecoverable injury. Mills died 11 days later on January 18, 2012. The coroner determined that Mills' cause of death was blunt force injuries of the head.

Detective Blake Mumma of the Wichita Police Department interviewed Gooding on January 7, 2012. After being advised of her *Miranda* rights, Gooding agreed to speak with Mumma. When asked about the events leading up to her vehicle striking Mills, Gooding's account started much the same as her later trial testimony. Gooding described her verbal exchange with Mills as an argument. However, her statement to Mumma differed from her trial testimony beginning at about the time she turned her car onto Kinkaid Street. Gooding told Mumma that she turned onto Kinkaid Street and that Mills followed her on foot. She then told Mumma that Mills dashed out in front of her car, causing her to make an abrupt stop. She stated that it appeared like Mills was going to strike the windshield with his fist. Gooding told Mumma that she wanted to get away from the situation, so she started to accelerate her car. At that point, Mills again jumped in front of the car and she could not avoid hitting him.

On January 11, 2012, the State charged Gooding with attempted murder in the first degree, a severity level 1 person felony. After Mills' death, the State filed an amended

6

complaint charging Gooding with murder in the first degree, an off-grid person felony. After a preliminary hearing, the district court bound over Gooding for trial.

Gooding's 4-day jury trial began on February 12, 2013. Thomas, Brown, O'Brien, Mumma, and Dickerson testified for the State, as well as other law enforcement personnel involved in the criminal investigation. Gooding testified on her own behalf. As previously discussed, her trial testimony differed from her initial statement to Mumma. The district court instructed the jury on premeditated first-degree murder, intentional second-degree murder, and voluntary manslaughter. Gooding asked for a jury instruction on involuntary manslaughter, but the district court declined her request. The jury found Gooding guilty of voluntary manslaughter.

On March 26, 2013, the district court sentenced Gooding to 71 months' imprisonment. The district court waived the BIDS attorney fees but ordered Gooding to pay the $100 application fee. Gooding timely appealed the district court's judgment.

SUFFICIENCY OF THE EVIDENCE

Gooding first argues that there was insufficient evidence to convict her of voluntary manslaughter because the State failed to prove that she had engaged in a sudden quarrel with Mills. Gooding acknowledges that she argued with Mills before she hit him with her car, but she maintains that she remained calm. Gooding concludes that a "mere argument" was not sufficient to make her lose control of her actions or reason.

The State's brief does not argue that there was sufficient evidence of a sudden quarrel to uphold Gooding's conviction of voluntary manslaughter. However, the State argues that Gooding invited any error because she requested a jury instruction on the lesser offense of voluntary manslaughter. The State also argues that even if there was insufficient evidence of a sudden quarrel, Gooding's conviction of the lesser crime of

7

voluntary manslaughter can be upheld because there was sufficient evidence to convict her of the greater crime of intentional second-degree murder.

As a preliminary matter, we will briefly address the State's assertion of invited error. Our Supreme Court has held that a litigant may not invite error and then complain of the error on appeal. See *State v. Divine*, 291 Kan. 738, 742, 246 P.3d 692 (2011). The State submits that Gooding cannot request a jury instruction on voluntary manslaughter and then argue there was insufficient evidence of a sudden quarrel to support the conviction. But Gooding requested a jury instruction on voluntary manslaughter committed "in the heat of passion" as opposed to voluntary manslaughter committed upon a sudden quarrel. Based on this fact alone, the State's invited error claim fails.

The State also argues that Gooding admitted at trial that there was evidence of a sudden quarrel. During closing argument, defense counsel made the following statement:

"If you cannot reach a verdict there, the law says you've got to consider voluntary manslaughter, the knowing—that the accused, Jessika Gooding, knowingly killed Christopher Mills. Knowingly is defined as the defendant acts knowingly when the defendant is aware of the circumstances in which she was acting. . . . You've got to decide whether or not she knowingly, and that is to say Jessika knowingly—if she was aware of the circumstances in which she was acting and it was done upon a sudden quarrel. *I suppose you could view the confrontation or conflict, if you will, between Jessika and Christopher in that 60 some feet of Kincaid Street or less as being some kind of a quarrel.*" (Emphasis added.)

Defense counsel proceeded to argue that the jury should return a verdict of not guilty on all the charges. The thrust of defense counsel's closing argument was that Gooding never intended to hit Mills with the car and there was reasonable doubt to acquit her of all charges. Gooding's closing argument does not constitute a waiver preventing her from challenging the sufficiency of the evidence to support her conviction on appeal.

8

Gooding's primary argument on appeal is that there was insufficient evidence to find her guilty of voluntary manslaughter because the State failed to prove that she engaged in a sudden quarrel with Mills. While Gooding acknowledges that she and Mills argued prior to the incident, she contends that this argument was not sufficient to cause her to lose control of her actions or reason. Furthermore, she asserts that even if the jury believed every aspect of the eyewitness' testimony, there was still no evidence that Mills provoked her immediately prior to the incident.

When the sufficiency of evidence is challenged in a criminal case, an appellate court reviews such claims by looking at all the evidence in a light most favorable to the prosecution and determining whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Frye*, 294 Kan. 364, 374-75, 277 P.3d 1091 (2012). In determining whether there is sufficient evidence to support a conviction, the appellate court does not reweigh the evidence or the credibility of witnesses. *State v. Hall*, 292 Kan. 841, 859, 257 P.3d 272 (2011).

Gooding was convicted of voluntary manslaughter under K.S.A. 2013 Supp. 21-5404(a)(1), which defines voluntary manslaughter as "knowingly killing a human being committed . . . [u]pon a sudden quarrel or in the heat of passion." The district court instructed the jury that in order to establish the charge of voluntary manslaughter, each of the following elements had to be proved: (1) Gooding knowingly killed Mills; (2) the killing was done upon a sudden quarrel; and (3) the act occurred on or about the 7th day of January 2012, in Sedgwick County, Kansas. The district court did not instruct the jury on the meaning of the term "sudden quarrel."

The Kansas Supreme Court has addressed the level of provocation necessary to support a voluntary manslaughter conviction in many prior decisions. "In order to reduce a homicide from murder to voluntary manslaughter, there must be provocation, and such provocation must be recognized by the law as adequate." *State v. Guebara*, 236 Kan. 791,

796, 696 P.2d 381 (1985). The provocation, whether it be a "sudden quarrel" or some other form of provocation, must be sufficient "to cause an ordinary man to lose control of his actions and his reason." 236 Kan. at 796. Thus, the test of the sufficiency of the provocation is objective, not subjective. 236 Kan. at 796.

"Mere words or gestures, however insulting, do not constitute adequate provocation, but insulting words when accompanied by other conduct, such as assault, may be considered." 236 Kan. at 797. Similarly, mere evidence of an altercation does not alone support a finding of sufficient provocation. *State v. Mitchell*, 269 Kan. 349, 353, 7 P.3d 1135 (2000) (quoting *State v. Haddock*, 257 Kan. 964, 987, 897 P.2d 152 [1995]). If assault or battery is involved, the defendant must have a reasonable belief that he or she is in danger of great bodily harm or at risk of death. *Mitchell*, 269 Kan. at 353.

The Kansas Supreme Court's interpretation of the term "sudden quarrel" as it relates to a conviction of voluntary manslaughter is grounded in the common law and is generally adopted in most other states. As discussed in a respected treatise on criminal law, in order to reduce a homicide from murder to voluntary manslaughter, there must be adequate provocation that "is calculated to deprive a reasonable [person] of self-control and to cause [the person] to act out of passion rather than reason." 2 Wharton's Criminal Law § 157 (15th ed. 1994). "At common law, mere words or gestures, however insulting, abusive, opprobrious, or indecent, do not constitute adequate provocation. But insulting words, when accompanied by other conduct, such as an assault, may be considered." 2 Wharton's Criminal Law § 158.

In *State v. Northcutt*, 290 Kan. 224, 224 P.3d 564 (2010), our Supreme Court recently addressed whether the evidence presented during a first-degree murder trial supported the defendant's request for a jury instruction on sudden quarrel voluntary manslaughter. In that case, the defendant and his brother were suspected of killing David Mason. In two custodial interviews with police, the defendant admitted to beating Mason

and confessed that he and his brother had gone to Mason's apartment with the intent to kill him. After the interviews, the defendant led officers to the location where he and his brother had buried Mason.

The defendant was charged with premeditated first-degree murder and conspiracy to commit first-degree murder. At trial, the defendant provided a very different version of events from the prior statements he had given to law enforcement officers. The defendant testified that Mason owed him money and that Mason had borrowed some camera equipment from him which he never returned. Mason lived in an apartment with the defendant's brother. The defendant told his brother that he wanted to confront Mason and instructed his brother to call him when Mason arrived at the shared apartment. The defendant's brother called a short time later, and the defendant immediately rode his bicycle to the apartment.

When the defendant arrived at the apartment, he brought with him a climber's "impelling rope" that he routinely used to secure his bicycle. The defendant testified that he came up behind Mason as he sat at a computer and "kind of kicked him in the butt" and asked if he had his camera. 290 Kan. at 229. Mason jumped up, bringing some computer cords with him. According to the defendant, the two men got "tangled up" in the computer cords and the impelling rope. 290 Kan. at 229. The arguing continued and the defendant eventually followed Mason into his bedroom. As the two men struggled, Mason fell backwards, hitting his head on the bed railing. At that point, the defendant testified that he and his brother left the apartment. The defendant testified that when he and his brother returned to the apartment the next day, they found Mason dead. The jury convicted the defendant of premeditated first-degree murder and conspiracy to commit first-degree murder. 290 Kan. at 231.

On appeal, the defendant argued that the district court erred in refusing to instruct the jury on voluntary manslaughter as a lesser included offense of premeditated first-

11

degree murder. The defendant argued that the jury could have believed that Mason provoked a sudden quarrel when he stood up from the computer and entangled the defendant in the computer cords, causing a fight to ensue.

Our Supreme Court acknowledged the defendant was entitled to a voluntary manslaughter instruction as long as there was some evidence which would reasonably justify a conviction of the lesser included crime. 290 Kan. at 233; see K.S.A. 2013 Supp. 22-3414(3). However, our Supreme Court stated that the defendant's argument "ignores Kansas precedent that requires *severe* provocation to justify giving a voluntary manslaughter instruction." (Emphasis added.) 290 Kan. at 233; see *e.g.*, *State v. Vasquez*, 287 Kan. 40, 55-56, 194 P.3d 563 (2008); *State v. Gallegos*, 286 Kan. 869, 874, 190 P.3d 226 (2008); *State v. Drennan*, 278 Kan. 704, 713, 101 P.3d 1218 (2004); *State v. Horn*, 278 Kan. 24, 40-41, 91 P.3d 517 (2004).

The *Northcutt* court further stated that "[u]nder our precedent, mere evidence of an altercation between parties does not alone support finding sufficient provocation" to justify instructing the jury on voluntary manslaughter as a lesser included offense. 290 Kan. at 234; see, *e.g.*, *Gallegos*, 286 Kan. at 874-75; *Mitchell*, 269 Kan. at 353. The *Northcutt* court noted that the test of the sufficiency of the provocation is objective, not subjective. 290 Kan. at 234. The court further stated that the provocation, whether it be a sudden quarrel or some other form of provocation, must be sufficient to cause an ordinary person to lose control of his or her actions and reason. 290 Kan. at 234; see also *Horn*, 278 Kan. at 40; *Guebara*, 236 Kan. at 796-97.

Considering these rules, the *Northcutt* court determined that "even if the jury accepted that Mason stood up and became tangled in the computer cords and [the defendant's] 'impelling rope,' such an action is not severe provocation; it is not an action that would cause an ordinary person to lose control of his or her actions and reason." 290 Kan. at 234. The court noted that even under the defendant's version of events, the

12

defendant started the fight and not Mason. The court concluded that because there was no evidence of provocation by Mason, much less severe provocation, the district court was not required to instruct the jury on voluntary manslaughter. 290 Kan. at 234-35.

Returning to our facts, Gooding testified that her argument with Mills began at the corner of Santa Fe and Kincaid Street, shortly after she left him at her mother's house. While Gooding's car was stopped at the intersection, Mills approached the passenger side of the car and was yelling at her to wait. She testified that Mills was "cussing [her] out" and waving his arms. Gooding alternatively described Mills as belligerent, hyped up, upset, mad, and pissed off. However, she testified that she was not mad during the encounter and remained calm despite Mills' actions.

Testimony presented by several of the State's witnesses painted a similar picture of the events. Thomas—the State's sole eyewitness—testified that he saw a man standing outside of a car on the grass waving both of his hands. Thomas testified that the man "looked like he was arguing with somebody inside the car." Thomas also told Brown that he saw Gooding and Mills arguing when Gooding ran over Mills with the car. Thomas testified that when Gooding asked to use his phone to call for help for Mills, she stated that "we were fighting, we were arguing." Detective Mumma testified that during his interview with Gooding, she described her verbal exchange with Mills as an argument.

Gooding's argument with Mills, by all accounts, consisted of angry words, cursing, and gestures stemming from Mills' belief that Gooding wrongfully left him behind. Through it all, Gooding maintained that she stayed calm and tried to get away from the situation. Our Supreme Court has repeatedly held that mere words or gestures, however insulting, do not constitute adequate provocation to support a conviction of voluntary manslaughter. See, *e.g.*, *Guebara*, 236 Kan. at 797. Even when considered in a light most favorable to the State, the evidence presented concerning Gooding's argument with Mills

13

failed to establish provocation sufficient to cause an ordinary person to lose control of his or her actions and reasons. *Northcutt*, 290 Kan. at 234; *Guebara*, 236 Kan. at 797.

At Gooding's trial, the district court did not instruct the jury on the meaning of the term "sudden quarrel" in order to support a conviction of voluntary manslaughter. We note that PIK Crim. 4th 54.170 on voluntary manslaughter defines the term "heat of passion" but the recommended instruction does not define the term "sudden quarrel." Assuming the evidence at Gooding's trial had been sufficient to support a jury instruction on voluntary manslaughter, the district court certainly could have assisted the jury by providing some guidance on the meaning of the term "sudden quarrel." But based upon many years of Kansas Supreme Court precedent, which is grounded in the common law, we agree with Gooding's primary claim on appeal that there was insufficient evidence of a sudden quarrel to support her conviction of voluntary manslaughter.

The State argues that even if there was insufficient evidence of a sudden quarrel, Gooding's conviction should be upheld under the analysis of *State v. Bradford*, 219 Kan. 336, 548 P.2d 812 (1976), *disapproved of on other grounds by State v. Berry*, 292 Kan. 493, 254 P.3d 1276 (2011), and *State v. Harris*, 27 Kan. App. 2d 41, 998 P.2d 524 (2000). These cases generally stand for the proposition that even if the evidence is insufficient to convict a defendant of a lesser degree of homicide, such as voluntary manslaughter, the conviction will be upheld if the evidence was sufficient to convict the defendant of a higher degree of homicide.

We will first examine the Kansas Supreme Court's decision in *Bradford*. In that case, the defendant was charged with first-degree felony murder, but he was convicted of second-degree murder. 219 Kan. at 337. On appeal, he argued that the district court erred in instructing the jury on second-degree murder because it was not a lesser included offense of felony murder. Our Supreme Court held that second-degree murder could be a lesser included offense of felony murder where the evidence of the underlying felony is

14

weak. 219 Kan. at 343. The court then noted that the submission of jury instructions on lesser included offenses is to the defendant's advantage and stated:

> "'. . . [T]he rule supported by most of the courts is that if the evidence demands or warrants a conviction of a higher degree of homicide than that found by the verdict . . . the defendant is not entitled to a reversal or a new trial on the ground that the court instructed on the lower degree of homicide as to which there was no evidence, the theory being that he is not prejudiced thereby and cannot complain. . . .' [Citation omitted.]" 219 Kan. at 344.

The rule in *Bradford* was recognized earlier by the Kansas Supreme Court in *State v. Carpenter*, 215 Kan. 573, 527 P.2d 1333 (1974). In that case, the defendant was charged with premeditated first-degree murder, but he was convicted of the lesser included offense of second-degree murder. On appeal, the defendant claimed the district court erred in instructing the jury on second-degree murder because the undisputed evidence showed that the killing was premeditated. In rejecting the defendant's argument, our Supreme Court relied on the "majority rule" that if the evidence is sufficient to support a conviction of a higher degree of homicide than that found by the verdict, the defendant cannot complain that the jury was instructed on a lower degree of homicide as to which there was no evidence. 215 Kan. at 578-79.

However, the *Carpenter* court further stated that in order for the rule to be applicable, all elements necessary to prove the lesser offense must be included in the elements required to establish the greater offense. 215 Kan. at 579. The court noted that "[s]econd-degree murder is clearly a lesser included offense under first-degree murder since all the elements of second-degree murder are included in the elements required to establish murder in the first degree." 215 Kan. at 579. See also *State v. Yargus*, 112 Kan. 450, 453, 211 P. 121 (1922) (defendant convicted of second-degree murder cannot complain about lack of evidence when evidence sufficient to support first-degree murder, noting that the greater offense includes all the elements of the lesser offense).

15

The Kansas Supreme Court's decisions in *Bradford*, *Carpenter*, and *Yargus* only applied to defendants convicted of second-degree murder as a lesser included offense of first-degree murder. However, the Court of Appeals extended the rule discussed in those cases to voluntary manslaughter in *Harris*. In that case, the defendant was charged with second-degree murder, but he was convicted of the lesser included offense of voluntary manslaughter upon a sudden quarrel or in the heat of passion. 27 Kan. App. 2d at 43. On appeal, this court agreed with the defendant's assertion that there was insufficient evidence to support a finding that the killing was committed upon a sudden quarrel or in the heat of passion. 27 Kan. App. 2d 44-45. Accordingly, this court found that the district court erred in instructing the jury on voluntary manslaughter. 27 Kan. App. 2d at 45.

The *Harris* court noted that a number of other jurisdictions have determined that when the defendant is charged with murder and is convicted of the lesser included offense of manslaughter, the conviction will stand even when there is no evidence to support the jury's finding of provocation, as long as the evidence is sufficient to convict the defendant of the greater crime of murder. 27 Kan. App. 2d at 45. After citing the rule discussed in *Bradford*, this court held that when a defendant is charged with second-degree intentional murder and convicted of sudden quarrel or heat of passion voluntary manslaughter, "the conviction may stand even absent evidence of sudden quarrel or heat of passion, as long as the evidence was sufficient to convict the defendant of second-degree intentional murder." 27 Kan. App. 2d at 46; see also *State v. Cobb*, 30 Kan. App. 2d 544, 562-64, 43 P.3d 855 (2002); *State v. Powell*, 30 Kan. App. 2d 390, 392, 42 P.3d 193 (2002). But see *State v. Diggs*, 194 Kan. 812, 817, 402 P.2d 300 (1965) (finding district court erred in instructing jury on manslaughter in the second degree when there was no evidence the killing was committed in a cruel and unusual manner).

Gooding argues that *Harris* is no longer good law because our legislature has amended several applicable statutes since the case was decided. At the time the defendant in *Harris* committed his offense in 1997, K.S.A. 21-3201(b) (Furse) provided:

16

"Intentional conduct is conduct that is purposeful and willful and not accidental. As used in this code, the terms 'knowing,' 'willful,' 'purposeful,' and 'on purpose' are included within the term 'intentional.'" In 1997, K.S.A. 21-3402(a) (Furse) defined second-degree murder as the killing of a human being committed intentionally. K.S.A. 21-3403(a) (Furse) defined voluntary manslaughter as the intentional killing of a human being committed upon a sudden quarrel or in the heat of passion. Therefore, when the *Harris* court compared the statutory elements of second-degree murder and voluntary manslaughter, each offense relied on the same culpable mental state of "intentionally." The court found that "[t]he sole distinction between intentional second-degree murder and voluntary manslaughter . . . was the presence of mitigating circumstances." 27 Kan. App. 2d at 46.

In 2011, our legislature amended the definitions of the various culpable mental states. The terms "intentionally" and "knowingly" are now separated and ranked by degree, with "intentionally" being ranked as a higher degree of culpability than "knowingly." K.S.A. 2013 Supp. 21-5202(b)(1)-(2). The statute provides that when intentional conduct is proven, knowing conduct is also proven. K.S.A. 2013 Supp. 21-5202(c). Second-degree murder is still defined as the killing of a human being committed intentionally. K.S.A. 2013 Supp. 21-5403(a)(1). However, voluntary manslaughter is now defined as the *knowing* killing of a human being committed upon a sudden quarrel or in the heat of passion. K.S.A. 2013 Supp. 21-5404(a)(1).

Gooding points out that the jury convicted her of voluntary manslaughter which means that the jury unanimously found that she *knowingly* killed Mills. But this finding does not establish that she *intentionally* killed Mills. As a result, Gooding contends that the rule in *Harris* does not apply here. Gooding also contends that the district court's jury instructions preclude this court from applying the *Bradford* and *Harris* analysis. Gooding points to jury instruction 5, which stated:  "When there is a reasonable doubt as to which of two or more offenses defendant is guilty, [s]he may be convicted of the lesser offense

17

only." Gooding contends that by finding her guilty of voluntary manslaughter, the jury necessarily possessed reasonable doubt as to the intent element of second-degree murder; thus, according to Gooding, the *Harris* rule does not apply.

Gooding's contentions have merit and we reject the State's argument that Gooding's voluntary manslaughter conviction can be upheld under the *Bradford*/*Harris* analysis. Initially, we note that the Kansas Supreme Court has never held that a voluntary manslaughter conviction may stand absent evidence of a sudden quarrel or heat of passion as long as the evidence was sufficient to convict the defendant of intentional second-degree murder. The Kansas Supreme Court's decisions in *Bradford*, *Carpenter,* and *Yargus* only applied to defendants convicted of second-degree murder as a lesser included offense of first-degree murder. Moreover, the Kansas Supreme Court has stated that the rule about lesser degrees of homicide applies only when all the elements necessary to prove the lesser offense are included in the greater offense. *Carpenter*, 215 Kan. at 579; *Yargus*, 112 Kan. at 453.

In Kansas, intentional second-degree murder is a lesser included offense of premeditated first-degree murder under the strict elements test set forth in K.S.A. 2013 Supp. 21-5109(b)(2). But voluntary manslaughter is a lesser included offense of murder only because it is a lesser degree of the same crime. K.S.A. 2013 Supp. 21-5109(b)(1); see *State v. Cheever*, 295 Kan. 229, 258, 284 P.3d 1007 (2012) (recognizing the following homicide degree crimes in descending order:  first-degree murder, second-degree murder, voluntary manslaughter, and involuntary manslaughter).

Voluntary manslaughter is not a lesser included offense of first or second-degree murder under the strict elements test because voluntary manslaughter includes the *additional* element of sudden quarrel or heat of passion that is not included in first or second-degree murder. Thus, it is questionable whether the *Harris* court properly extended the rule about lesser degrees of homicide to a voluntary manslaughter

18

conviction. The decision in *Harris* did not address the language in Kansas Supreme Court decisions stating that the rule applies only when all the elements in the lesser offense are included in the greater offense. *Carpenter*, 215 Kan. at 579; *Yargus*, 112 Kan. at 453.

Even if *Harris* was correctly decided at the time, subsequent legislative changes have negated the court's holding. When *Harris* was decided, there was no distinction under the criminal code between an intentional act and a knowing act. As Gooding points out, the terms "intentionally" and "knowingly" now are separated and ranked by degree, with "intentionally" being ranked as a higher degree of culpability than "knowingly." K.S.A. 2013 Supp. 21-5202(b)(1)-(2). Second-degree murder is still defined as the killing of a human being committed intentionally. K.S.A. 2013 Supp. 21-5403(a)(1). Voluntary manslaughter is now defined as the *knowing* killing of a human being committed upon a sudden quarrel or in the heat of passion. K.S.A. 2013 Supp. 21-5404(a)(1).

When *Harris* was decided, the sole distinction between intentional second-degree murder and voluntary manslaughter was the presence of mitigating circumstances, *i.e.*, sudden quarrel or heat of passion. *Harris*, 27 Kan. App. 2d at 46. So when *Harris* was decided, if the defendant was found guilty of voluntary manslaughter but it was later determined that there was insufficient evidence to instruct the jury on sudden quarrel or heat of passion, an appellate court could still conclude, without engaging in any judicial fact-finding, that the evidence was sufficient to convict the defendant of the greater offense of intentional second-degree murder. Any error in instructing the jury on voluntary manslaughter was harmless and worked in the defendant's favor.

Now if a defendant is found guilty of voluntary manslaughter but there was insufficient evidence to instruct the jury on sudden quarrel or heat of passion, it does not necessarily follow that the evidence was sufficient to convict the defendant of the greater offense of intentional second-degree murder. The premise of the *Harris* rule is that a voluntary manslaughter conviction will stand absent evidence of sudden quarrel or heat

19

of passion, "as long as evidence was sufficient to convict the defendant of second-degree intentional murder." 27 Kan. App. 2d at 46.

The State essentially argues that this court should uphold Gooding's voluntary manslaughter conviction as long as there may have been sufficient evidence to support a conviction of intentional second-degree murder. But the jury, and not this court, was the factfinder in this case. As Gooding argues, the jury was instructed to consider the lesser offenses of second-degree murder and voluntary manslaughter only if the jury did not agree that Gooding was guilty of first-degree murder. The jury also was instructed that "[w]hen there is a reasonable doubt as to which of two or more offenses defendant is guilty, [s]he may be convicted of the lesser offense only." We can only assume from the verdict that the jury possessed reasonable doubt that Gooding was guilty of either first or second-degree murder. Once again, the *Harris* rule only applies "as long as the evidence was sufficient to convict the defendant of second-degree intentional murder." 27 Kan. App. 2d at 46. It is not the role of this court to find that the evidence was sufficient to convict Gooding of second-degree intentional murder when the jury rejected such a finding.

In summary, we conclude there was insufficient evidence of a sudden quarrel to uphold Gooding's conviction of voluntary manslaughter. We also reject the State's argument that we should uphold Gooding's conviction under the *Bradford* and *Harris* analysis. Because this ruling is dispositive of Gooding's case, we need not address the other issues she has raised on appeal. Accordingly, we must reverse the district court's judgment and remand with directions to discharge Gooding.

Reversed and remanded with directions.