NOT DESIGNATED FOR PUBLICATION

No. 122,111

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

BRADLEY D. AUE,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sumner District Court; WILLIAM R. MOTT, judge. Opinion filed January 28, 2022. Affirmed.

*Ryan J. Eddinger*, of Kansas Appellate Defender Office, for appellant.

*Kerwin L. Spencer*, special prosecutor, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, P.J., WARNER and HURST, JJ.

PER CURIAM: After a trial in which the State charged Aue with second-degree intentional murder and alternatively second-degree reckless murder, a jury convicted Aue of the requested lesser included offense of voluntary manslaughter for killing his girlfriend, Sierra Craft. Aue now challenges his conviction in two ways. First, he claims the State lacked sufficient evidence to support his conviction for the very offense he requested, and second, he claims the district court erred by including jury instructions that his claimed defense of voluntary intoxication to the second-degree intentional murder charge was not also a defense to the alternative charge of lesser included

1

offenses. Upon thorough review of the record, this court finds that the district court did not err in the challenged jury instructions and the jury had sufficient evidence upon which to convict Aue of voluntary manslaughter beyond a reasonable doubt. Aue's conviction is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

Emergency personnel, Chad Francisco and Matt Harsh, arrived at the home shared by Aue and Craft at about 7:49 p.m. on Thursday, May 24, 2018. Upon arrival, Francisco and Harsh found Aue on the front porch and Craft lying on the couch, cold to the touch, nude, bloody, and nonresponsive. After attempting life-saving measures, Craft died at the scene.

*The Timeline*

According to Wellington Police Department Detective Bobby Wilson's testimony, Aue stated in an interview that he worked that day from approximately 7 a.m. to 3:30 p.m., and then he and Craft went to his cousin's house to borrow money. Craft and Aue then went to the grocery store with their young child from about 4:08 p.m. until 4:17 p.m. Wilson reviewed the grocery store video surveillance of that trip and testified that Aue was wearing a red shirt and jeans and Craft wore capri leggings and a blue or purple shirt. Wilson did not observe any injuries on Aue or Craft in the video. Aue, Craft, and their minor child then returned home and Aue told Wilson that he and Craft drank about five to six shots of vodka each in about 20 minutes.

One of Aue's neighbors, Durell Harrington, testified that he arrived home between 6:15 and 6:30 p.m. that day and upon exiting his car he heard a female voice yelling from inside Aue's house. Harrington stood outside the door of his home listening and eventually understood the woman inside Aue's home had yelled "Why would you do this

2

to me" or "Why did you do this to me" two to three times. He waited about a minute and heard no other yelling and then went inside his home. Aue and Craft had a history of disputes that sometimes involved the police. Aue's sister testified that Craft and Aue had an "unhealthy" relationship that involved a lot of alcohol and arguments. Sometimes his sister would pick up their child to remove him when Craft and Aue had been drinking.

Ariana Chromy, Aue's next door neighbor, testified that at around 7:20 p.m. on May 24, shortly after Harrington heard a woman yelling, she heard glass breaking from the direction of Aue's house. The noise caused Chromy to look out her window toward Aue's house, but she saw no one in the backyard or climbing through the window at Aue's house. Chromy returned to her activities, but she heard her dog barking at about 7:50 p.m., so she went outside and saw Aue "covered in blood" saying, "'It's not good. I'm going to jail. They're going to blame me for this.'" Chromy asked if he was ok and Aue responded "I am, but she's not," and asked Chromy to call 911, which she did. Chromy's house had video surveillance with audio of Aue at her home.

Chromy and Aue then went to Aue's residence, where Chromy saw Craft laying on the couch. Aue explained "'[s]he moved because she was on the floor.'" Aue went to the kitchen as Chromy tried to locate Craft's pulse on her neck and wrist. Chromy told the 911 operator she could not find a pulse and Craft was not breathing. At that time emergency medical personnel arrived at the home and began assessing Craft.

*Craft's Injuries*

Before emergency personnel arrived, Chromy saw Craft lying naked on the couch with "two huge great big black eyes." Vic Sandell, the assistant chief of the Wellington Fire Department, along with Francisco and Harsh, were all dispatched to the Aue residence for a medical emergency. Harsh entered the house first and moved Craft from the couch to the floor. He stated Craft was cold to the touch and did not appear to have a

3

pulse. Francisco tried to inject lifesaving medications, but Craft was unconscious and in critical condition. Francisco testified that Captain Jerry Preston did manual chest compressions, after which Francisco used a machine to attempt to start Craft's heart.

Craft had a wound on her arm that was so deep the fatty tissue and tendon were exposed. The wound was not bleeding when emergency personnel arrived, but she started bleeding again after they performed chest compressions. Emergency personnel noted that upon arrival, Craft's right eye appeared black and swollen and that her left eye became bruised and swollen as time passed. Emergency personnel testified that their life-saving measures did not cause any facial bruising, but resuscitation attempts could cause existing bruising to intensify more quickly. After their lifesaving efforts proved unsuccessful, the medics ceased attempting to resuscitate Craft at 8:31 p.m.

Timothy Gorrill, a forensic pathologist, performed Craft's autopsy. Gorrill testified that Craft's cause of death was from sharp force injuries to the right upper arm where evidence showed she had deep lacerations that exposed a vein and cut an artery, in addition to other significant blunt force injuries. He testified, "The most important immediate cause of death, contributing cause of death" was "the severed vessels and hemorrhage . . . from the right arm." Craft also had a broken nose and severe bruising across her eyes and forehead. Aside from her facial injuries, Craft had bruising and scratches across her body and large chunks of hair pulled out of her head. She had bruising on her left calf, left hand, and a cut on her left knuckle. She also had scrapes all over her body. The autopsy referred to Craft's missing hair as "traumatic alopecia."

The autopsy included a blood alcohol concentration (BAC) analysis which determined Craft's BAC was .303 and .273 in two different samples—levels well above the legal limit for intoxication. Gorrill agreed that someone with BACs in Craft's range might not even know that they are injured. Based on Craft's injuries observed during the autopsy, Gorrill determined Craft's death was a homicide.

4

*Aue's Appearance and Statements at the Scene*

Aue arrived at Chromy's house asking her to call 911 wearing white shorts, no shirt, no shoes, and smoking a cigarette. Chromy testified that he appeared to be covered in blood, and she saw a mark on his neck that appeared to be a bite mark, and he had a bleeding knuckle on his hand.

While waiting outside Chromy's house and using her phone, Aue spoke to the 911 operator on a recorded call. When the 911 operator asked Aue what was going on, he replied "it's a bunch of alcohol, I don't know. I know she does, she smokes weed and so on and so forth and like it's been like an on and off like fighting tonight." Emergency personnel arrived, along with Officer Matt Nelson, where Officer Nelson observed Aue with what appeared to be blood on his shorts, chest, hands, legs, back, neck, and stomach. Nelson asked Aue what happened and Aue repeatedly stated, "It's not the same."

Officers realized a young child, who Aue identified as his, was inside the residence. Officers removed the child and requested that Aue stay with him outside. As Aue was leaving the house, he told officer Nelson that he and Craft had been drinking vodka and he thought Craft smoked marijuana. Aue also stated he had not left the residence that night. Eventually Nelson handcuffed Aue and placed him in the patrol car because he refused to follow instructions, cooperate with safety requests, and preserve evidence.

Nelson testified he could smell alcohol on Aue's breath and noticed what looked like a bite mark on his neck. Galen Tieszen, a registered medical technologist at Sumner Community Hospital, collected a blood sample from Aue around 1:40 a.m. on May 25, 2018. Forensic toxicologist Carrie Hodges determined that Aue's blood alcohol level at 1:40 a.m.—about five hours after the initial 911 call—was 0.10 grams per 100 milliliters of blood, which is over the legal limit to drive.

*The Residence*

Emergency personnel testified that Aue's house had a considerable amount of blood in the hallway and the bedroom, including blood stains on a mattress and a broken window, as well as large clumps of hair on the floor. There was blood in the entryway leading to the living room, the hallway, the kitchen, the bathroom, and blood smears on walls with pooled blood in the living room area. The mattress in the bedroom with the broken window contained considerable blood as well. Emergency personnel described the house as a "violent scene."

Eric Moore, a forensic scientist with the Kansas Bureau of Investigation, analyzed the bloodstain patterns at Aue's residence. Moore determined that Craft's major injury to her right arm likely occurred at the broken window. After Craft sustained the injury to her right arm, she likely moved away from the window and into the living room. Moore determined Craft was at least partially through the bedroom window while she was bleeding. The cut caused by the window most likely severed the artery in Craft's arm. Moore testified that the bloodstains suggested Craft was in an upright position during a portion of the bloodshed, and on or near the floor by the entryway to the living room where there were blood patterns on the wall near the floor.

There were no transfer blood stains outside the house from an object moving through wet blood. Although blood was found outside the house near the bedroom window that matched Craft's DNA, the only blood on the exterior of the house was on the siding, the ground, the vegetation, and the glass on the ground near that window. Moore testified that if Craft were outside the house and cut her arm he would expect to see blood transfer in the vegetation outside the house, on the exterior siding, and on the bottom window frame—none of which was present. According to Moore, the blood evidence showed that Craft sustained her injury inside the house and that the blood outside the house could have resulted from her arm hanging out of the window.

Moore also noted the scene of the incident was altered after bloodshed. First, the shorts Aue was wearing appeared to have diluted blood on them and contained primarily Aue's DNA with only a minor partial of Craft's DNA—even though her blood was splattered all around the house. Two clothing items that appear much like the clothing Aue was seen wearing earlier that day were found in the house with what appeared to be blood stains on them. Additionally, blood-stained clothing was found under a rug that did not appear to have resulted from blood flowing through the rug.

The State charged Aue with intentional murder in the second degree, in violation of K.S.A. 2017 Supp. 21-5403(a)(1) and alternatively with murder in the second degree by reckless conduct in violation of K.S.A. 2017 Supp. 21-5403(a)(2). Aue pled not guilty to both charges and proceeded to trial. At trial, Aue requested, and received, jury instructions on the lesser included charges of voluntary and involuntary manslaughter. After a week-long trial in August 2019, a jury convicted Aue of voluntary manslaughter. The district court denied Aue's motion for a downward or durational departure and sentenced him to 61 months' imprisonment. Aue appeals.

DISCUSSION

On appeal, Aue claims (1) the district court erred by including jury instructions about the inapplicability of voluntary intoxication to his charge of reckless second-degree murder and the instructions for voluntary and involuntary manslaughter; and (2) that the State failed to present sufficient evidence to support his voluntary manslaughter conviction.

7

I.       *The district court did not err by including the challenged voluntary intoxication jury instructions.*

Aue requested a jury instruction for voluntary intoxication as a defense to the charge of intentional second-degree murder—rendering him incapable of forming the necessary intent to kill required for the charge. In return, the State requested and received an instruction that voluntary intoxication was not a defense to the alternative second-degree reckless murder charge or the lesser included manslaughter offenses. Aue claims the district court erred by including PIK Crim. 4th 52.050—which states: "Voluntary intoxication is not a defense to a charge of [insert crime]"—for the three lower charges. Aue asserts that the inclusion of this sentence was factually inappropriate because it was repeated multiple times and potentially confused the jury.

This court analyzes jury instruction challenges in a four-step progression. First, it considers whether the issue is properly reviewable based on preservation and jurisdiction standpoints; second, this court determines whether the instruction was legally appropriate; third, it determines whether the instruction was factually appropriate; and finally, if an error occurred, this court will determine whether it requires reversal. *State v. Green*, 311 Kan. 960, 983, 469 P.3d 1228 (2020). As a preliminary matter, Aue objected to the inclusion of the PIK Crim. 4th 52.050 jury instruction language in the instructions for reckless second-degree murder, voluntary manslaughter, and involuntary manslaughter—arguing it was unnecessary and including it three times overemphasized its importance. Thus, Aue preserved this issue for review. See *State v. Perez-Medina*, 310 Kan. 525, 533-34, 448 P.3d 446 (2019).

As to legal appropriateness, "'an instruction must always fairly and accurately state the applicable law . . . .'" *State v. Murrin*, 309 Kan. 385, 392, 435 P.3d 1126 (2019). This court exercises unlimited review of whether an instruction is legally appropriate. 309 Kan. at 391. When, as here, a district court follows the Kansas Pattern Jury instructions, it

8

is "more than likely the instruction will be legally correct, not because of any independent legal significance of the pattern instruction, but because the committee usually writes an instruction that accurately reflects the law." *State v. Wimbley*, 313 Kan. 1029, 1031, 493 P.3d 951 (2021). The challenged portion of the instructions—taken verbatim from PIK Crim. 4th 52.050—derives from K.S.A. 2020 Supp. 21-5205(b), which states:

> "An act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind."

In other words, the defense of voluntary intoxication applies only to specific intent crimes such as the intentional second-degree murder charge in this case. Thus, the defense of voluntary intoxication was not available as to the charges of reckless second-degree murder, voluntary manslaughter, and involuntary manslaughter. See *State v. Claerhout*, 310 Kan. 924, 935-37, 453 P.3d 855 (2019). Aue concedes that the language the district court included was legally appropriate as it fairly and accurately stated the law.

Finding that the jury instruction was legally accurate, the next question is whether the challenged portion of these instructions was factually appropriate—whether the instruction was supported by the particular facts of the case. *Green*, 311 Kan. at 983. A defendant is generally entitled to jury instructions applicable to their defense theory so long as the evidence sufficiently permits a rational fact-finder to find for the defendant on that theory. *Murrin*, 309 Kan. at 391-92. "This court examines jury instructions as a whole, without focusing on any single instruction, to determine whether they properly and fairly state the applicable law or whether it is reasonable to conclude that they could have misled the jury." *Claerhout*, 310 Kan. at 936.

9

The challenged jury instructions accurately stated that voluntary intoxication was not a defense to the charge. As Aue requested, the district court instructed the jury that voluntary intoxication could negate the intent required for the intentional second-degree murder charge. The jury also received instructions that Aue's voluntary intoxication defense was inapplicable to the alternative second-degree reckless murder charge and the lesser included offenses—making the instructions factually appropriate. While Aue never argued that his intoxication should have been considered as a defense to any other crime, it does not render the language from PIK Crim. 4th 52.050 factually inappropriate. As the Kansas Supreme Court has explained:  "The jury is entitled to know the law applicable to the case before it, including whether the defendant can employ a voluntary intoxication defense to the charges against [them]." *State v. Kershaw*, 302 Kan. 772, 779, 359 P.3d 52 (2015). Moreover, because the instructions correctly stated the law concerning the defense of voluntary intoxication, this court struggles to see how these accurate instructions could have caused any ambiguity or confused the jury. Aue presented evidence of voluntary intoxication as a defense; therefore, it was factually appropriate for the district court to instruct the jury as to which charges that defense applied.

Finding the challenged instructions were both legally and factually appropriate, this court need not consider the final step of reversibility.

II.      *Sufficient evidence supported Aue's conviction for voluntary manslaughter.*

Aue also contends that the State failed to present the jury with sufficient evidence to support his conviction for voluntary manslaughter. The State argues that Aue's challenge is barred under the doctrine of invited error. Both parties are incorrect.

1. *The invited error doctrine does not preclude Aue's claim.*

This court often decides appeals from a district court's refusal to include a jury instruction on the lesser included offense of voluntary manslaughter, viewing the evidence in the light more favorable to the party seeking its introduction—typically the defendant. See, e.g., *State v. Gallegos*, 313 Kan. 262, 266, 485 P.3d 622 (2021). A lesser included offense is a crime that is a lesser degree of the same crime charged. See K.S.A. 2020 Supp. 21-5109(b). Unlike those cases, here, the district court granted Aue's request for an instruction on the lesser included offenses of voluntary and involuntary manslaughter—and the jury ultimately found Aue guilty of voluntary manslaughter. Now Aue seeks reversal of his conviction, alleging the jury lacked sufficient evidence to convict him of the very offense he requested.

The State argues that Aue's claim fails because he requested the instruction for voluntary manslaughter and thus invited the error. However, the State cannot avoid its evidentiary burden simply because the defendant requested a legally appropriate instruction. See, e.g., *State v. Boldridge*, No. 121,942, 2021 WL 3573831, at *4 (Kan. App. 2021) (unpublished opinion). The standard for inclusion of a lesser included charge differs from the standard for the sufficiency of the evidence to support such a charge. *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018). Aue's request for jury instructions on a lesser included charge is unrelated to whether the State can sufficiently prove the elements of that charge. See *State v. Bethel*, 275 Kan. 456, 474, 66 P.3d 840 (2003) ("[T]here is no backing away from the requirement that the State prove every element of the offense charged by proof beyond a reasonable doubt. The State must do so in order to gain a conviction."). Simply put, Aue's request for a legally permissible charge does not alleviate the State of its burden to prove the elements of that charge. *State v. Kettler*, 299 Kan. 448, 471, 325 P.3d 1075 (2014) (". . . there must be evidence supporting each element of a crime . . . .").

If availing, the State's argument would undermine a core tenet of the judicial system—that the State must prove the defendant's guilt beyond a reasonable doubt. The State's argument lacks merit—as has been explained by numerous panels of this court. See, e.g., *Boldridge*, 2021 WL 3573831, at *4-5; see also *State v. LeGrand*, No. 108,389, 2013 WL 6331597, at *14 (Kan. App. 2013) (unpublished opinion) (holding the invited error rule did not preclude a claim when defendant was challenging sufficiency of evidence); *State v. Folley*, No. 89,368, 2004 WL 1714918, at *1 (Kan. App. 2004) (unpublished opinion) ("[T]he invited error rule simply cannot trump a defendant's right to have every element of the crime proved."). The invited error rule does not preclude or diminish Aue's claim that the State lacked sufficient evidence to support his conviction.

2. *There was sufficient evidence of a sudden quarrel to sustain Aue's conviction for voluntary manslaughter.*

This court evaluates a defendant's challenge to the sufficiency of the evidence supporting a conviction by reviewing the evidence in the light more favorable to the State and asks whether "a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Rosa*, 304 Kan. 429, 432-33, 371 P.3d 915 (2016). However, in making this determination this court will not reweigh the evidence, resolve evidentiary conflicts, or make witness credibility determinations—these determinations are all within the province of the jury. *Kettler*, 299 Kan. at 472. This court looks only to evidence supporting the verdict and will uphold a conviction so long as it is sustained by any competent evidence. *State v. Van Pham*, 234 Kan. 649, 668, 675 P.2d 848 (1984). Even circumstantial evidence may be sufficient to support a verdict so long as "it permits the factfinder to draw a reasonable inference regarding the fact(s) in issue." *State v. Banks*, 306 Kan. 854, 859, 397 P.3d 1195 (2017). It is only in rare cases in which testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt that a guilty verdict will be reversed. *State v. Torres*, 308 Kan. 476, 488, 421 P.3d 733 (2018).

12

To convict Aue of voluntary manslaughter the State had to prove that he knowingly killed a person "[u]pon a sudden quarrel or in the heat of passion" or "upon an unreasonable but honest belief that circumstances existed that justified use of deadly force." See K.S.A. 2020 Supp. 21-5404(a). Aue did not argue that he justifiably killed Craft—so the State must show that he "knowingly" killed her "[u]pon a sudden quarrel or in the heat of passion." See K.S.A. 2020 Supp. 21-5404(a). The Kansas Supreme Court has succinctly described the elements of voluntary manslaughter as a killing committed knowingly and with legally sufficient provocation. *State v. Campbell*, 308 Kan. 763, 775, 423 P.3d 539 (2018).

Aue claims that the State failed to prove the second element of voluntary manslaughter by failing to produce evidence that he was sufficiently provoked into killing Craft. Kansas courts have explained that "[m]ere words or gestures, however offensive, do not constitute legally sufficient provocation for a finding of voluntary manslaughter." *State v. Hayes*, 299 Kan. 861, 866, 327 P.3d 414 (2014); see also *Woods*, 301 Kan. 852, 878, 348 P.3d 583 (2015) (holding that a verbal confrontation between husband and wife was not enough to cause an ordinary person to lose control of their actions); *State v. Northcutt*, 290 Kan. 224, 233-34, 224 P.3d 564 (2010) ("Kansas precedent . . . requires severe provocation to justify giving a voluntary manslaughter instruction. . . . [M]ere evidence of an altercation between parties does not alone support finding sufficient provocation."). To address Aue's contention, it is necessary to delve into the Kansas jurisprudence on this element.

Here, the district judge instructed the jury on both "sudden quarrel" and "heat of passion" stating that the State must prove "[t]he defendant knowingly killed Sierra Craft" and "[i]t was done upon a sudden quarrel or in the heat of passion." While the jury was not given a definition of "sudden quarrel," the Kansas Supreme Court has given the phrase its common meaning. See *State v. Johnson*, 290 Kan. 1038, 1043-44, 1046, 236 P.3d 517 (2010) (defining "sudden quarrel" and explaining that in Kansas, "'[c]ommon

13

words have their common meaning'"). The jury here was told that "heat of passion" incorporates "any intense or vehement emotional excitement which was spontaneously provoked from circumstances. The emotional state of mind must be of such degree as would cause an ordinary person to act on impulse without reflection." So, according to *Johnson*, a "sudden quarrel" can constitute sufficient provocation of "heat of passion" to sustain a charge for voluntary manslaughter. 290 Kan. at 1048 (". . . Kansas, along with most states, considers sudden quarrel to be one form of heat of passion."). Determining whether a person acts in the "heat of passion" is an objective standard—requiring provocation sufficient to "deprive a reasonable person of self-control and cause that person to act out of passion rather than reason." *Gallegos*, 313 Kan. at 267.

Here, there is sufficient evidence from which a jury could infer a "sudden quarrel" occurred involving far more than mere words or gestures that created sufficient provocation for Aue to act in the heat of passion. See, e.g., *State v. Zapata-Grimaldo*, No. 117,831, 2018 WL 6071478, at *3 (Kan. App. 2018) (unpublished opinion) (upholding a conviction for attempted voluntary manslaughter when evidence showed a "heated argument" where the circumstances could convince a reasonable fact-finder the defendant acted in the "heat of passion"); *State v. Ernzen*, No. 78,271, 1998 WL 36035751, at *3 (Kan. App. 1998) (unpublished opinion) (upholding a voluntary manslaughter conviction when circumstantial evidence could support an inference of a sudden quarrel). A sudden quarrel can be sufficient provocation of "heat of passion" to warrant a jury instruction for voluntary manslaughter. See, e.g., *State v. Bernhardt*, 304 Kan. 460, 476, 372 P.3d 1161 (2016) ("'A sudden quarrel can be one form of heat of passion.'").

The Kansas Supreme Court has defined a "quarrel" as "'[a]n altercation or angry dispute; an exchange of recriminations, taunts, threats, or accusations between two persons.'" *Bernhardt*, 304 Kan. at 476 (quoting Black's Law Dictionary 1363 [9th ed.]). A quarrel involving violence can also be evidence of sufficient provocation supporting an instruction for voluntary manslaughter. See *State v. Guebara*, 236 Kan. 791, 797, 696

14

P.2d 381 (1985) (when ". . . persons engage in mutual combat, the blows given by each are adequate provocation to the other; thus, if one kills the other, the homicide may be reduced to voluntary manslaughter." [citing 2 Wharton's Criminal Law § 159]).

Craft's body showed ample evidence of a violent quarrel involving more than mere words. She had a broken nose, black eyes, bruises, scrapes on her hands and legs, large clumps of hair pulled out of her head, and severe cuts to her arm. Aue's house also showed evidence of an angry dispute with a window broken from the inside, evidence of Craft's blood on the broken glass outside the house, and large clumps of what appeared to be Craft's hair on the floor. Additionally, Aue's body showed signs of a violent quarrel involving more than mere words—with an injury to his neck that appeared to be either a bite mark or scratches, an injury to his knuckle, and his own blood on his shorts.

There was also sufficient evidence that the quarrel between Craft and Aue occurred suddenly—without a cooling off period and was not ongoing throughout the day. The Kansas Supreme Court defined "sudden" using its common meaning as: "'1. Happening without warning; unforeseen. 2. Characterized by hastiness; abrupt; rash. 3. Characterized by rapidity; quick; swift.'" *Johnson*, 290 Kan. at 1048 (quoting American Heritage Dictionary of the English Language 1286 [1969]). Craft and Aue left the grocery store with their young son on the day of her murder at about 4:17 p.m. Officer Wilson viewed video footage of the three at the grocery store and did not see any injuries to Craft or witness a dispute between Craft and Aue. Aue told Wilson that after leaving the grocery store he and Craft then went home and began drinking. The evidence establishes they drank extensively during that time, with both having a high BAC many hours later.

There is sufficient evidence from which a jury could conclude that after drinking heavily, a dispute suddenly erupted, and was occurring at 6:30 p.m. when a neighbor heard a woman repeatedly yell a phrase similar to "why would you do that to me?" from

15

inside Aue's house—and that dispute ended at around 7:15-7:20 p.m. when another neighbor heard glass breaking. The blood throughout the home, including handprints and footprints, and Gorrill's testimony that the scene had been altered after bloodshed, demonstrates that some time had lapsed after Craft sustained the deadly arm injury and when Aue went to the neighbor's house to call for help. By the time emergency personnel arrived at about 7:49 p.m., Craft's body was cold, nonresponsive, and she was no longer bleeding from her lacerations. The timeline establishes rapidity, abruptness, and haste.

There is no evidence of a break or cooling off period, ongoing argument, or premeditation that could negate the "heat of passion." Aue stated he and Craft had been fighting on and off after returning home that evening, but that he never left the house. Aue stated, "[i]t's different this time. I don't know. It just feels different this time." Aue also repeatedly said "it's not the same" to different emergency responders. Upon seeing emergency personnel, Aue stated, "I don't know what happened." Additionally, their young child was present in the small home during the entire dispute. Aue's sister testified that in the past when the couple argued or drank extensively, they would call her to pick up the child—but no one called her that evening. Additionally, there is no evidence their quarrel was ongoing throughout the day or that Aue acted with calculation or premeditation. Aue worked all day and there's no evidence he and Craft argued during that time. After Aue finished work, they went to Aue's cousin's house to borrow money, and the grocery store with no evidence of a dispute or injuries to Craft. The first evidence of a dispute occurred at about 6:30 p.m., just 45 minutes before the neighbor heard glass breaking, which a jury could reasonably infer was the sound of the window breaking that ultimately caused Craft's death.

Unlike cases with clear evidence of premeditation where Kansas courts have found insufficient evidence of provocation to support inclusion of an instruction for voluntary manslaughter, here, there is no evidence Aue acted with premeditation. See, e.g., *Green*, 311 Kan. at 986-87 (holding a voluntary manslaughter instruction was

factually inappropriate where no evidence of provocation existed and the defendant was convicted of premeditated first-degree murder); *State v. Parker*, 311 Kan. 255, 266, 459 P.3d 793 (2020) (finding that a voluntary manslaughter jury instruction was factually inappropriate because there was "so little evidence" of provocation and "so much evidence" of premeditation). The jury had ample evidence, including the presence of Aue's and Craft's child, both Craft's and Aue's injuries, the "violent scene" at the home, and Aue's statements, to conclude that he killed Craft after being intensely and spontaneously provoked during their violent, sudden quarrel.

The jury reviewed all the evidence available and had the opportunity to weigh the credibility of the witnesses and the attorney arguments. After viewing all the evidence, the jury found that Aue was sufficiently provoked, and it could rely on circumstantial evidence and draw reasonable inferences to reach that conclusion. "'A conviction of even the gravest offense can be based entirely on circumstantial evidence and the inferences fairly deducible therefrom. If an inference is a reasonable one, the jury has the right to make the inference.'" *State v. McClelland*, 301 Kan. 815, 820, 347 P.3d 211 (2015). This court will not reweigh evidence or question the credibility decisions of the jury. *Chandler*, 307 Kan. at 668.

CONCLUSION

This court finds both of Aue's claims unpersuasive. The district court did not err in its jury instruction that voluntary intoxication was not a defense to second-degree reckless murder, voluntary manslaughter, or involuntary manslaughter. Additionally, there was sufficient evidence upon which a reasonable fact-finder could rely to convict Aue of voluntary manslaughter.

Affirmed.